90 F.3d 1291
 11 IER Cases 1675, 24 Media L. Rep. 2227
 Giles JEFFERSON, Plaintiff-Appellant,
v.
C. Karl AMBROZ, Director of Court Services, individually and
in his official capacity, Vincent Murphy, Chief Operating
Officer of Adult Probation Division and Deputy Director of
Court Services, individually and in his official capacity,
Ron Parrett, Chief Operating Officer of Juvenile Probation
Division and Deputy Director of Court Services, individually
and in his official capacity, Lynn Laney, Supervisor of
Adult Probation Division, individually and in her official
capacity, Defendants-Appellees.
 No. 95-2960.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 21, 1996.
Decided July 25, 1996.
 
 Jimmie L. Jones, Chicago, IL, Fred R. Kimmel (argued), Kimmel & Associates, Chicago, IL, for Giles Jefferson.
 Rita M. Novak, Laura Wunder (argued), Office of Atty. Gen., Chicago, IL, for Karl C. Ambroz, Vincent Murphy, Ron Parrett and Lynn Laney.
 Before CUMMINGS, MANION, and ROVNER, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 Giles Jefferson, a Rockford, Illinois probation officer, participated in a radio talk show program where he made some extremely critical comments regarding the local criminal justice system. However, when he did so, he did not speak as Giles Jefferson; rather, he identified himself as "George," a local gang member. The comments "George" made evidently received substantial attention in the community. Jefferson was terminated when the Rockford probation office later discovered that he had impersonated "George." Jefferson brought suit alleging that the termination violated the First Amendment. For the following reasons, we affirm the district court's dismissal of his claims.
 
 I.
 
 2
 The facts alleged in Jefferson's complaint, which we accept as true for the purposes of a motion to dismiss, Travel All Over The World, Inc. v. Saudi Arabia, 73 F.3d 1423, 1428 (7th Cir.1996), are as follows: On July 27, 1993, local and federal law enforcement officers arrested numerous alleged members of the Black Gangster Disciples. The arrests led to substantial discussion among the citizens of Winnebago County. On July 28, 1993, the arrests were the topic of the "Chris Bowman Show," a talk show on WROK radio in Rockford. Jefferson telephoned the show and identified himself as "George," a local gang member.[1] He discussed gangs and drugs and was very critical of the Rockford Police Department and the Illinois Seventeenth Judicial Circuit, which is located in Rockford.
 
 
 3
 Around August 20, 1993, defendants Parrett, the Chief Operating Officer of Juvenile Probation, and Laney, the Supervisor of Adult Probation, confronted Jefferson and asked him if he was "George" from the talk show. He responded, "no comment." On September 21, 1993, Jefferson again called WROK, again identified himself as "George," and again heavily criticized the Rockford criminal justice system. Two days later, Parrett and Laney questioned Jefferson regarding the second "George" call and again he responded, "no comment." He gave the same answer when he was subsequently questioned by defendants Ambroz, Director of Court Services, and Murphy, Chief Operating Officer of Adult Probation and Deputy Director of Court Services. Three days later, Jefferson was suspended. He received the following letter from Ambroz relating to the suspension, which he quoted extensively in his complaint:
 
 
 4
 [O]n July 28, 1993, you misrepresented yourself as a Black Gangster Disciple to a call-in program to WROK under the name of "George," you castigated and impugned the integrity of the local police department and the judicial system. On August 20, 1993, as you were suspected to be the caller by the staff and supervisors of the Probation Department, you were confronted by Supervisors Parrett and Laney as to your identity as "George" in the two and a half hour call-in to WROK as well as to your simultaneous tardiness of a couple of hours on the same date. You categorically denied that you were "George" or that you were the caller into WROK. You explained your tardiness on the premise of "having a flat tire."
 
 
 5
 * * * * * *
 
 
 6
 On September 21, 1993 you once again called WROK as a gang member "George"; this time from your work station and desk telephone at the Department. After approximately eight and a half minutes conversation with the host of WROK, Chris Bowman, you were interrupted in your call by a staff member and you broke off conversation with the radio station. On this particular occasion, you once again made unwarranted and unfounded accusations about the Rockford Police Department's handling of [a] very sensitive case that was currently in the middle of a criminal trial, and you left no doubt that you had no respect for the judicial process. You did the aforementioned while you were on duty as an Officer of the Court.
 
 
 7
 On September 23, 1993, in a telephone conversation on this date to the Rockford Register Star reporter, Neal Justin, you admitted that you were the caller, "George" and on the same day you admitted to the radio host of WROK, Chris Bowman, that you and "George" were one and the same.
 
 
 8
 On September 23, 1993, at approximately 11:20 p.m., you called my home and you apologized that you lied to me and the supervisors on September 21, 1993 and that you, in fact, were the caller "George."
 
 
 9
 On September 25, 1993, the Rockford Register Star published an article written by Neal Justin entitled "OFFICER POSED AS GANGSTER." The Star later published another article entitled "DISMISS 'GEORGE,' THE FAKER," which stated, among other things,
 
 
 10
 One morning this past summer, Jefferson called a local radio talk show under the guise of George, a member of the Black Gangster Disciples, and expounded in fascinating detail on life and death in the street-gang underworld. In the process, he second-guessed the criminal prosecution of Antonio Craig, who since has been convicted of the attempted murder of a Rockford police officer. He also conveyed what he admits was "a positive message" about gangs.
 
 
 11
 Good work, George--or Giles. You not only spilled confidential information gained through your position of authority, but you also put a problematic chill on relations between the police and the court agency for which you work.
 
 
 12
 Jefferson attached both articles to his complaint.
 
 
 13
 At an October 4, 1993, hearing regarding Jefferson's conduct, Ambroz, Murphy, Parrett and Laney each testified as to the events described in the above letters. Jefferson apparently denied nothing. He was subsequently terminated and Ambroz sent him the following letter laying out precisely the reasons why:
 
 
 14
 You lied and violated the trust with your immediate Supervisor Laney and Parrett. Neither feels that hereafter they may trust you again with privileged or confidential information or even trust you with the day-to-day responsibilities of a Court Officer.
 
 
 15
 You have grievously damaged our Department's professional relationship with the Rockford Police Department and your misconduct may have effectively undermined our professional relationship with all the law enforcement agencies of this community.
 
 
 16
 You have permanently damaged our working relationship with the Winnebago County State's Attorney's Office by your conduct. The Adult Probation Department has been denied access to the State's Attorney's Office [which] perceives [your actions] as a breach of confidence and loss of trust between the two offices.
 
 
 17
 Your misconduct and your disrespectful and unfounded criticism of the criminal justice process in Winnebago County has severely compromised our relationship with the courts.
 
 
 18
 * * * * * *
 
 
 19
 Your false radio call-in conduct has called into question our Department's reputation with the general public and the agencies that our Department comes into contact with in the community.
 
 
 20
 Finally, and perhaps most importantly, your position as a Probation Officer requires you to supervise probationers, insuring that these probationers comply with the orders of the Court and the laws of the State. To do this, you must be seen as a[n] officer of the Court who commands the respect of the Court and also has respect for the Court. Given your public pronouncements, I cannot see how you could ever carry out the duties of your office or instill in the probationers the requisite degree of respect for the rule of law that is required to discharge your duties as a Probation Officer or that you might ever command respect of the Court.
 
 
 21
 On May 13, 1994, Jefferson filed a twelve-count complaint against the captioned defendants.[2] The complaint alleged a variety of causes of action ranging from invasion of privacy to intentional infliction of emotional distress, and requested over $31 million in compensatory and punitive damages. On March 2, 1995, pursuant to Fed.R.Civ.P. 12(b)(6), the district court dismissed ten of the twelve counts with prejudice for failure to state a claim upon which relief could be granted. Jefferson does not appeal the dismissal of those counts. The court also dismissed the two First Amendment counts on the ground that Jefferson had "pleaded himself out of court" by making allegations that indicated, as a matter of law, that Rockford's right to run its probation office properly outweighed Jefferson's right to speak out in the manner he did. However, the court dismissed these counts without prejudice and allowed Jefferson 21 days in which to file an amended complaint regarding the alleged First Amendment violation.
 
 
 22
 On March 27, 1993, Jefferson filed a two-count First Amended Complaint. One count related to a defendant who was voluntarily dismissed and is thus unimportant here, and the other made exactly the same allegations concerning the First Amendment violation as the first complaint. Defendants again filed motions to dismiss, Jefferson again failed to respond, and on July 10, 1995, the district court dismissed Jefferson's First Amended Complaint with prejudice. Jefferson now appeals claiming that he either had, or could have, alleged facts sufficient to establish that the termination was a First Amendment violation.
 
 II.
 
 23
 We first address whether Jefferson had alleged sufficient facts to establish a claim for a First Amendment violation. The Federal Rules of Civil Procedure do not require that a complaint describe alleged wrongdoing with particularity. See Fed.R.Civ.P. 8(a) (requiring only a "short and plain statement of the claim"). However, if a plaintiff chooses to "plead particulars, and they show he has no claim, then he is out of luck--he has pleaded himself out of court." Thomas v. Farley, 31 F.3d 557, 558-559 (7th Cir.1994). Here Jefferson pleaded the following facts underlying his claim, which the defendants do not dispute: (1) Jefferson assumed the identity of a gang member on a radio call-in show; (2) he spoke out against the Rockford Police Department and the local court system; (3) he later admitted that he was the caller; (4) the fact that he had made calls was published to the Rockford community through the media; and (5) he was terminated because the defendants felt that his actions and speech made it impossible for the probation office to operate effectively with Jefferson still on board. These facts conveyed sufficient information for the court to rule on Jefferson's First Amendment claim.
 
 
 24
 It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570. However, because the government as an employer has broader powers than the government as a sovereign, the First Amendment does not apply to government employees in the same manner as it does to general citizens. Thus while the First Amendment prohibits the criminalization of offensive utterances, see Cohen v. California, 403 U.S. 15, 24-25, 91 S.Ct. 1780, 1786-88, 29 L.Ed.2d 284, it does not prohibit "a government employer [from] bar[ring] its employees from using ... offensive utterance[s] to members of the public, or to the people with whom they work." Waters v. Churchill, 511 U.S. 661, ----, 114 S.Ct. 1878, 1886, 128 L.Ed.2d 686. The difference in treatment stems from the fact that "[g]overnment agencies are charged by law with doing particular tasks, [and] when someone who is paid a salary [to] contribute to an agency's effective operation begins to do or say things that detract from [that] operation, the government employer must have some power to restrain her." Id. at ----, 114 S.Ct. at 1888.
 
 
 25
 The Supreme Court has given clear instructions on how courts are to analyze situations where government employees are terminated because of their speech. First, the court must determine whether "the employee spoke 'as a citizen upon matters of public concern' or 'as an employee upon matters only of personal interest.' " United States v. National Treasury Employees Union, --- U.S. ----, ----, 115 S.Ct. 1003, 1013, 130 L.Ed.2d 964 (quoting Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708); Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811. If the employee spoke upon matters of public concern, his speech is protected if his interest in the expression outweighs " 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs.' " Connick, 461 U.S. at 142, 103 S.Ct. at 1687 (quoting Pickering, 391 U.S. at 568, 88 S.Ct. at 1734-35). The government bears the burden of justifying the adverse employment action. Rankin v. McPherson, 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315; Caruso v. De Luca, 81 F.3d 666, 667 (7th Cir.1996).
 
 
 26
 Jefferson initially contends that the district court should not have applied the Pickering/Connick balancing test at the pleading stage of this dispute because his complaint did not establish exactly what he said as "George." It is true that to ascertain whether a government employee's termination violated the First Amendment (i.e., applying the Pickering/ Connick test), courts should look to the "content" of the employee's speech. See Waters, 511 U.S. at ----, 114 S.Ct. at 1884. However, to do so a court need only know the "content" of the speech as it relates to the employee's interest in his statements, not as it relates to exactly what was said. In other words, the court need only know the gist of what the employee said, not the precise words he used to express himself. Here Jefferson pleaded that his speech was a critique of the Rockford Police Department and the local court system. That is sufficient for us to identify his interest in his speech, and thus sufficient to apply the Pickering/Connick test.
 
 
 27
 Jefferson's speech was clearly of public concern and the first prong of the test is satisfied. Thus the next question is whether Jefferson's interest in his statements outweighs Rockford's interest in promoting the efficiency of its judicial system. To answer this question, this Court will take into consideration the following factors:
 
 
 28
 (1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.
 
 
 29
 Caruso, 81 F.3d at 670. With these factors in mind, it is clear that Rockford's interest in the efficient operation of its probation department far outweighs Jefferson's interest in the speech in question.
 
 
 30
 Loyalty and confidence are critical to a probation officer's position. Probation officers are the intermediary between the judicial system and those who are released into society, but remain under its supervision. Among other things, the probation officer directly supervises the probationers, keeps the courts informed of developments in each case, and prepares presentence reports that are used to assess later punishment. Accordingly, the State must have confidence that its "point men" can be trusted to represent the State in the officer-probationer relationship in a responsible manner. Jefferson's comments to the Rockford public criticized the system he represented and undoubtedly damaged his supervisors' confidence in him.
 
 
 31
 Moreover, his statements potentially caused damage to the probation office's public image and relationship with other law enforcement agencies. Despite specifically alleging that the defendants terminated him on the basis of this damage, and attaching the defendants' letters to support this claim, Jefferson now argues that dismissal was unwarranted because his complaint did not establish the truth of the defendants' conclusions. However, whether those conclusions are true is not critical to our analysis. The Supreme Court has made clear that we are to "look to the facts as the employer reasonably found them to be," and that the government is entitled to consider the "potential disruptiveness of the speech." Waters, 511 U.S. at ---- - ----, 114 S.Ct. at 1889-1890 (emphasis added); see also Patkus v. Sangamon-Cass Consortium, 769 F.2d 1251, 1258 (7th Cir.1985) (noting that a court should look to the "ordinary or foreseeable effect of the conduct ... to determine whether it would be reasonably calculated to create division or to have impaired discipline"). Here it was reasonable for the defendants to believe that Jefferson's statements would cause problems to the probation department. The criminal justice system necessarily requires an element of cohesion between the multiple agencies that comprise the system. That cohesion is substantially impaired when a member of one agency chooses to criticize the others on public airwaves.
 
 
 32
 More important, however, is the damage the statements potentially caused the department's ability to supervise effectively Rockford's probationers. As noted above, a probation officer is the most important contact between the court system and the probationers. The biggest responsibility of a probation officer is to ensure that probationers comply with the orders of the court. That ability is necessarily injured when probationers believe that their probation officer lacks confidence in the system--a conclusion that seems inevitable in Jefferson's case. In light of these facts, the defendants' conclusion that Jefferson would be unable to perform his duties effectively in the future was not unreasonable.
 
 III.
 
 33
 Jefferson's final claim is that dismissal of his complaint was improper because he could have proven other facts at trial that would have given rise to a valid First Amendment claim. Specifically, he contends that he could have proven the following: (1) his statements contained no confidential information and were truthful; (2) he never knew that his true identity would be discovered and thus never intended to harm the probation department; (3) his statements were healthy and robust for the community; and (4) any damage between the probation department's relationship with other government agencies could have been patched up by less severe means than firing him (e.g., putting him in a non-public-contact position until "the heat blew over"). None of these additional facts, however, would have changed the result of Jefferson's case.
 
 
 34
 First, the defendants did not expressly rely, nor need they have, on whether Jefferson's statements contained confidential information. The statements were damaging enough merely as an expression of a probation officer's opinion. Second, there is no requirement that employees act with the specific intent to harm before the government employer may terminate them. That Jefferson did not anticipate being caught is thus of little relevance. Third, government employers, at least on these facts, need not accommodate those employees who engage in agency-damaging speech by finding non-public-contact positions for them until "the heat blows over." And finally, whether Jefferson's statements were healthy and robust for the community is not decisive. There are many statements that may contain ideas that are healthy for the community, but may still result in permissible termination when spoken by a government employee. See Waters, 511 U.S. at ----, 114 S.Ct. at 1886 (noting that while a private individual is free to "uninhibitedly and robustly criticize a state governor's legislative program, [the First Amendment does not prohibit] the governor from firing a high-ranking deputy for doing the same thing") (citing Branti v. Finkel, 445 U.S. 507, 518, 100 S.Ct. 1287, 1294-95, 63 L.Ed.2d 574).
 
 IV.
 
 35
 For the foregoing reasons, the dismissal of Jefferson's First Amendment claims is AFFIRMED.
 
 
 36
 ILANA DIAMOND ROVNER, Circuit Judge, concurring.
 
 
 37
 Although I agree with the majority's analysis of Jefferson's First Amendment claim given the extraordinary facts that Jefferson has alleged, I nevertheless write separately to underscore my view that the proper application of the Pickering-Connick balancing test to speech that is conceded to be on a matter of public concern would, as a general matter, require a more fully developed factual record. In particular, I believe that in order to strike the appropriate balance between an employee's interest as a citizen in expressing himself on a matter of public concern and the state's interest as an employer "in promoting the efficiency of the public services it performs through its employees," Pickering, 391 U.S. at 568, 88 S.Ct. at 1734-35, and thus to give the values that lie at the heart of the First Amendment their proper weight, it is ordinarily necessary to know somewhat more about what the employee said (or what the employer reasonably believed the employee said, see Waters, 511 U.S. at ---- - ----, 114 S.Ct. at 1889-90) than would be conveyed by the mere characterization of that speech as "critical," or even "extremely critical," of other public officials or employees.
 
 
 38
 The right to criticize public officials is, after all, protected by the First Amendment, Wilbur v. Mahan, 3 F.3d 214, 215 (7th Cir.1993), and the issue of whether a public employer has a sufficiently good reason to justify infringing upon that right by dismissing the employee will generally depend in significant part on the nature of the criticism that was voiced. See Pickering, 391 U.S. at 569-73, 88 S.Ct. at 1735-37. To take an obvious example, speech that accurately exposes official impropriety or corruption may certainly be described as highly critical of the officials it targets, yet it has generally been accorded the greatest level of First Amendment protection. See, e.g., Feldman v. Philadelphia Housing Authority, 43 F.3d 823, 829-31 (3d Cir.1994). Indeed, the interest of the employee in speaking out to uncover government malfeasance has often been held to outweigh the interest of the employer in maintaining harmony in the workplace. See Conner v. Reinhard, 847 F.2d 384, 390-91 (7th Cir.), cert. denied, 488 U.S. 856, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988); Johnson v. Multnomah County, Oregon, 48 F.3d 420, 427 (9th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 2616, 132 L.Ed.2d 858 (1995); Feldman, 43 F.3d at 831; O'Connor v. Steeves, 994 F.2d 905, 915-16 (1st Cir.), cert. denied, 510 U.S. 1024, 114 S.Ct. 634, 126 L.Ed.2d 593 (1993); Powell v. Gallentine, 992 F.2d 1088, 1091 (10th Cir.1993). Thus, because the test articulated in Pickering "is truly a balancing test," (see Feldman, 43 F.3d at 830), requiring us to weigh competing interests, I believe that the court must, in the usual case, know more about the actual content of the employee's expression beyond the fact that it is "extremely critical" of the employer.
 
 
 39
 The Court's decision in Waters is instructive in this regard. In Waters, where the actual content of the employee's speech was in dispute, the Supreme Court held that the employer was entitled to act on the basis of "the facts as the employer reasonably found them to be," 511 U.S. at ----, 114 S.Ct. at 1889 (emphasis in original). The reasonableness of the employer's conclusions concerning what the employee said would, in turn, be assessed on the basis of the way in which the employer arrived at those conclusions, including the procedures it used to ascertain the content of the speech. Id. at ---- - ----, ----, 114 S.Ct. at 1884-86, 1889. If all that a court needed to know to proceed to the Pickering balancing test were that the employee's speech was "extremely critical" of the employer, one wonders why the Supreme Court would have required employers to come to reasonable conclusions about what an employee actually said, not to mention reasonable assessments of the disruptive potential of that speech, before being entitled to restrict it without offending the employee's First Amendment rights. See id. The requirement that employers follow adequate procedures when faced with uncertainty about the actual content of speech indicates that actual content is indeed important to arriving at a just balance of interests. See id. at ----, 114 S.Ct. at 1889 ("If an employment action is based on what an employee supposedly said, and a reasonable [employer] would recognize that there is a substantial likelihood that what was actually said was protected, the [employer] must tread with a certain amount of care.")
 
 
 40
 I agree nonetheless that in the present case we can properly conclude on the basis of all the facts before us that the defendants were clearly justified in dismissing Jefferson for the criticism to which he subjected the local police department and the court. As Jefferson himself has conceded, in addition to launching into a lengthy and severe critique of those officials on the public airwaves on two separate occasions, Jefferson decided to do so from the perspective of a local street gang member. In criticizing the police department and the court from the standpoint of a gang member, Jefferson embraced a position that was fundamentally at odds with his position as an officer of the court, thus amply justifying his superiors' determination that public confidence and the confidence of the court in the probation department would be gravely compromised by Jefferson's continued employment. On the basis of Jefferson's expression, his employer was entirely reasonable in doubting Jefferson's loyalty to the probation department and its mission.
 
 
 41
 One final comment. I do not understand the majority's opinion to suggest that the Pickering balancing test may be applied when the court knows nothing more than the "gist" of the employee's speech. I would be unable to join such a holding. Fortunately, this case does not require such broad measures. Our application of the balance does not rest solely on the "gist" of Jefferson's speech, but on all of the facts discussed by the majority. I therefore join the majority in its conclusion that Jefferson's interest in his speech was clearly outweighed by his employer's interest in protecting the public image, integrity, and efficient operation of the probation department.
 
 
 
 [1]
 Jefferson's complaint did not state that he took on the role of a gang member, only that he called himself "George." However, his brief to this Court repeatedly refers to this role, and his counsel confirmed it at oral argument
 
 
 [2]
 Jefferson's suit originally included Winnebago County, Illinois, Winnebago County's Sheriff, the Rockford Register Star, Neal Justin, and an unknown Rockford Register Star reporter. These defendants have all been voluntarily dismissed