**Thomas CAMPBELL, Plaintiff–Appellant**

v.

**HAMILTON COUNTY, OHIO, et al., Defendants–Appellees**

No. 00–3116.

United States Court of Appeals, Sixth Circuit.

Oct. 17, 2001.

Before MARTIN, Chief Judge; SUHRHEINRICH, Circuit Judge; OLIVER,* District Judge.

PER CURIAM.

Plaintiff–Appellant Thomas Campbell ("Campbell"), a former probation enforcement officer for the Hamilton County Municipal Court, appeals the decision of the district court granting summary judgment to Defendants–Appellees Andrew H. Hitz ("Hitz"); Timothy A. Shannon ("Shannon"); Hamilton County, Ohio; and the State of Ohio, on his claims that the Appellees violated his First Amendment rights and unlawfully discriminated against him in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* For the following reasons, we AFFIRM.

## I. BACKGROUND

Campbell, who is Caucasian, was employed by the Hamilton County, Ohio, Municipal Court, as a probation enforcement officer from 1995 to 1997. During Campbell's tenure as a probation officer, Hitz was the Chief of the Hamilton County Probation Department and Shannon was an Assistant Chief.

In the spring of 1997, Campbell was asked to resign as a result of two incidents of misconduct. The first occurred in mid-March of 1997, and involved another probation officer, Wiley Ross ("Ross"). At this time, Campbell allegedly painted the projectile portion of a .38 caliber bullet black and placed it on Ross's desk. Perceiving this to be racially hostile conduct, Ross filed a formal complaint against Campbell. In his complaint, Ross also accused Campbell of calling him "Buckwheat" and "Skillet." As a result of Ross's complaint, Campbell was given a two-day

suspension, a warning about the Municipal Court's zero tolerance for violation of public or employee rights, and notice that a second violation within a year could result in suspension or termination of employment.

The second incident occurred a couple of weeks later and involved a conversation between Campbell and a female probationer, Michelle Back ("Back"). Campbell was not Back's probation officer but knew her because she worked in a restaurant across the street from the Probation Department. On March 28, 1997, Campbell and Back were discussing Back's upcoming court appearance before Hamilton County Municipal Court Judge William J. Mallory, Jr. ("Judge Mallory"). In the course of the conversation, Campbell allegedly told her, "Whatever you do, don't dress up in court, Mallory strokes [1] pretty, white women." Joint Appendix ("J.A.") at 108–09.

After Back filed a written complaint against Campbell, an investigation ensued. The investigation produced conflicting accounts of the incident. Campbell denies that he made the alleged statement. When interviewed, Campbell stated that he told Back, in the presence of several other officers, "Well, don't take Mallory lightly ... Mallory will stroke you ... Mallory—he is one of the hardest judges that we have on our program." J.A. at 93. According to Campbell, the other probation enforcement officers present—Ross, Sheriff's Deputy Richard Moorman ("Moorman"), and Probation Officer Jeffrey Seaman ("Seaman")—were the ones commenting about how Ms. Back should physically appear in court before Judge Mallory.

Moorman's version of the incident corroborated Campbell's. He testified that

---

* The Honorable Solomon Oliver, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

1. The term "stroke" means to give a probationer a stiff sentence.

Officer Ross told Back, "[Y]ou know, Mallory is going to stroke you. Don't wear anything too nice...." J.A. at 129. When interviewed, Ross's account matched Back's, at least to the extent that it was Campbell who made the statement about Judge Mallory. Although he could not remember the exact wording, he agreed that Campbell had made a statement similar to the one Back attributed to him. In contrast to Back, who testified that only she and Campbell were present when the statement was made, Ross testified that he and Moorman were also present when Campbell gave his advice about Judge Mallory to Back. Finally, Seaman would not confirm or deny any portion of the conversation, claiming that he was not present for it.

In hopes of resolving the factual inconsistencies between the accounts of the incident, Shannon requested that the two principally involved in the investigation, Back and Campbell, submit to polygraph examinations. On April 18, 1997, both Campbell and Back voluntarily underwent polygraph examinations administered by Police Specialist Royce Winters ("Winters") of the Cincinnati Police Department Polygraph Unit.

According to Winters, "[t]here were significant physiological disturbances indicative of deception in Thomas Campbell's polygraph records." J.A. at 410. He concluded that Campbell was deceptive in his answers on the exam. In addition, in the post-examination interview, Campbell attributed the offending statement to Seaman but then later said that he was not sure who had made it. He thereafter admitted that he was withholding information and requested to speak with his attorney.

Winters found that "[t]here were no significant physiological disturbances indicative of deception in Michelle Back's polygraph records" and stated that in his opinion, she was truthful in her answers. J.A. at 410. In spite of his conclusions, the polygraph exam showed that Back was overwhelmingly deceptive when she answered "no" to the question, "Did you lie about Thomas Campbell telling you Mallory strokes pretty white women?" J.A. at 636–37. During the pretest interview process for the polygraph exam, Back revealed that she had had a sexual relationship with Ross for two months at the time of the exam.

After learning of a possible inappropriate sexual relationship between Back and Ross, Shannon conducted an internal investigation into the matter. Based on the results of the investigation, which yielded evidence substantiating Back's claim of a relationship with Ross, Ross was discharged. Ross was never asked to undergo a polygraph exam regarding the Judge Mallory comment. Appellees assert that this was because they had sufficient evidence to terminate him due to his relationship with Back regardless of what insight a polygraph exam might have had into Ross's involvement in the Judge Mallory incident. In his deposition, Shannon gave the following explanation as to why he did not require Officer Ross to undergo the exam:

> Quite frankly, my reticence with Mr. Ross struck to the fact that there was some fairly significant tension between the department and Mr. Ross at that point in time, arising from a previous disciplinary action involving Mr. Campbell. And Mr. Ross had made it relatively clear in questions—or not questions, but statements off the taped record, before and after the tape began running, that if this situation began to even look like retaliation by the department against him as a result of his complaints against Campbell, that we would be up to our eyeballs in litigation. So, it did not seem wise at

that point to point a finger of suspicion at Mr. Ross unless and until I had a very pointed finger to use.

J.A. at 599–601.

Meanwhile, following the investigation of Ross, Shannon recommended that Campbell be discharged due to the inappropriate nature of the statement he allegedly made about Judge Mallory to Back. Shannon concluded that there was reasonable cause to believe Back and her version of the incident despite the results of her exam on the question as to whether she lied about who made the Judge Mallory statement. Together with the earlier complaint filed by Ross against Campbell, Campbell's statement about Judge Mallory constituted his second act of racial and/or gender discrimination within one year, in violation of departmental policy.

Hitz presented a brief written summary of Campbell's misconduct to the judges of the Hamilton County Municipal Court. A majority of the judges signed an Entry directing that Campbell be discharged. Thereafter, Michael L. Walton ("Walton"), Court Administrator for the Hamilton County Common Pleas Court, called Campbell into his office and informed him of the Judges' Entry. Pursuant to his standard practice, Walton offered Campbell the opportunity to submit a letter of resignation in lieu of termination. Plaintiff then resigned on or about April 22, 1997.

Campbell brought suit against Hitz, Shannon, in both their official and private capacities, and Hamilton County, claiming that they had violated his procedural and substantive due process rights, his First Amendment rights, as well as Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* Thereafter, Campbell filed an Amended Complaint naming the State of Ohio as an additional defendant. All of the Defendants moved for summary judgment, which the district court granted in full. Campbell now appeals the district court's ruling with respect to his Title VII and First Amendment claims.

## II. DISCUSSION

### A. Standard of Review

This court reviews *de novo* a district court's decision to grant summary judgment. *Thomas v. United States*, 213 F.3d 927, 929 (6th Cir.2000). Summary judgment is proper when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The judge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists only if a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248.

### B. Campbell's Title VII Claim

Title VII prohibits discrimination in employment on the basis of race. 42 U.S.C.2000e–2(a)(1). A plaintiff may prove discrimination by direct evidence or by circumstantial evidence using the inferential burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Campbell's reverse discrimination claim is based on circumstantial evidence; thus, his claim must be analyzed under the *McDonnell Douglas* framework.[2] This

---

**2.** Campbell maintains that this case should not be analyzed under *McDonnell Douglas*

because "there is undisputed direct evidence of blatant reverse discrimination" against

test is comprised of the following three steps:

◼ the plaintiff must establish a *prima facie* case of discrimination; (2) the employer must articulate some legitimate, nondiscriminatory reason for its actions; and (3) the plaintiff must prove that the stated reason was in fact pretextual.

Under this analysis, the ultimate burden of persuasion remains with the plaintiff at all times. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

### 1. *Prima Facie* Case

◼ In order to establish a *prima facie* case of reverse discrimination, a plaintiff must show that " 'background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority,' and ... that the employer treated differently employees who were similarly situated but not members of the protected group." *Murray v. Thistledown Racing Club, Inc.,* 770 F.2d 63, 67 (6th Cir.1985) (quoting *Parker v. Baltimore and Ohio Railroad Co.,* 652 F.2d 1012, 1017 (D.C.Cir.1981)). *See also Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 801–02 (6th Cir.1994). The district court held that Campbell failed to establish either prong of a *prima facie* case of reverse discrimination.

### a. Background Circumstances

◼ A plaintiff can establish the background circumstances requirement by producing evidence of the defendant's unlawful consideration of race in the past which justifies the "suspicion that incidents of

capricious discrimination against whites because of their race may be likely." *Jamison v. Storer Broad. Co.,* 1987 WL 44901, *3 (6th Cir. Sept. 30, 1987) (citations omitted). *See also Sampson v. Secretary of Transp.,* 1999 WL 455399, *1 (6th Cir. June 23, 1999) (finding that plaintiff had established background circumstances prong of reverse discrimination *prima facie* case with evidence that the defendant's policies and procedures reflected a preference for establishing a diverse group of employees); *Murray,* 770 F.2d at 68 (holding that where majority of individuals in position plaintiff sought were white and where no employer practices were grounded in affirmative action program, plaintiff could not show background circumstances).

◼ Campbell cites to the fact that racial tension was rampant in the probation department as evidence that Appellees discriminate against the majority. He argues that this tension resulted in Shannon performing a one-sided investigation into the Judge Mallory statement, requiring Campbell, but not Ross, to undergo a polygraph examination. Campbell claims that Shannon's explanation for not requiring Ross to take the exam—his fear that Ross would perceive such action as retaliation for his complaint against Campbell—supports this position.

We agree with the district court that Campbell has not provided sufficient evidence to support the suspicion that Appellees are that unusual employer who discriminate against the majority. Assuming that Campbell's allegations of rampant racial tension in the department are accu-

---

him. Appellee's Final Brief at 33. However, the case is properly analyzed as a disparate treatment case given that it was pled as such:

Plaintiff was also the victim of *disparate treatment* in that he was constructively discharged in whole or in part based on alleged racially hostile statements and/or conduct attributed to him even though African-

American employees of the Probation Department made equally or more egregious racially based statements but were not so disciplined.

Amended Complaint ¶ 36, J.A. at 25. Furthermore, we do not agree that Campbell has put forth direct evidence of reverse discrimination.

rate, he still has presented no evidence that those in the majority suffer particularly as a result. Shannon's efforts to reduce such tension by not requiring a polygraph examination of Ross are not enough to meet the first prong of Campbell's *prima facie* case. During Shannon's investigation into the Judge Mallory incident, he questioned all individuals allegedly involved and only once when the responses proved inconclusive did he require Back and Campbell to undergo polygraph exams. His decision to first require only the two principals involved was reasonable and there is no evidence that it was motivated by discriminatory animus. Based on the results of the polygraph exams, Shannon concluded that Campbell had made the offending statement. Even if Shannon's conclusion was wrong, it does not give rise to a federal cause of action on Campbell's behalf. *See Bishop v. Wood*, 426 U.S. 341, 349–50, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (holding that personnel decisions based on erroneous, incorrect or mistaken information do not give rise to a federal cause of action). Moreover, once Back revealed that she and Ross had been involved in a sexual relationship, Ross came under investigation for that behavior. As soon as Back's statements were corroborated, Ross was terminated, eliminating the need for him to be further investigated in connection with the Judge Mallory incident.

### b. Similarly Situated

The district court was also correct in concluding that Campbell cannot prove that he was treated differently than similarly-situated African–American individuals in the probation department.

■ Employees may be considered similarly situated if a plaintiff can prove that all of the relevant aspects of his employment situation are nearly identical to those of the employees who he alleges were treated more favorably. *Pierce*, 40 F.3d at 802. This means that "the individuals with whom the plaintiff seeks to compare his treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct." *Mitchell*, 964 F.2d at 583. Differences in job title and responsibilities, experience, and disciplinary history may establish that two employees are not similarly situated. *See Pierce*, 40 F.3d at 802; *Gore v. Runyon*, 113 F.3d 1234 (6th Cir.1997); *Martin v. The United States Playing Card Co.*, 172 F.3d 48 (6th Cir.1998).

■ Campbell believes that he and Ross should have been treated in the same manner during the investigation into the Judge Mallory matter because he and Ross were similarly situated with respect to both their positions and to the incident in question. Campbell points out that he and Ross held the same position as probation officers, were subject to the same standards, and had the same responsibilities and duties. Campbell argues that he and Ross were similarly situated with respect to the incident because there was evidence that Ross had actually made the statement about the judge. He claims that Shannon should therefore have had Ross take a polygraph test during the investigation.

We disagree. Campbell and Ross were not similarly situated with respect to the statement about the judge because Back accused Campbell, not Ross, of making the statement. As already noted, Shannon's decision to first only require the two individuals principally involved in the incident—Back and Campbell—was reasonable. Once it was discovered that Ross had had a sexual relationship with Back, he was immediately discharged for that conduct and it became unnecessary to examine him in relation to the Judge Mallory incident.

■ Campbell also asserts that he was similarly situated to Gary Boyle ("Boyle"), a supervisor in the probation department, with respect to both the bullet incident and the Judge Mallory incident. Immediately following the OJ Simpson verdict, Boyle and a Caucasian officer had a racially charged disagreement over the verdict. Both individuals were counseled by a court administrator but did not receive any further discipline. At the time of this incident, Boyle had over ten years of experience in the Probation Department and had one other incident of misconduct on his record from three years earlier.

Campbell is not similarly situated to Boyle. Campbell and Boyle had different job titles, different levels of experience at the time they were disciplined, and different disciplinary histories. At the relevant time periods, Campbell was a probation officer with three years of experience and Boyle was a supervisor with over ten years of experience. This, alone, is enough to prevent Campbell and Boyle from being considered similarly situated. However, the incidents for which the two men were disciplined also cannot be considered similar. As the district court noted, the OJ Simpson trial was a highly controversial and polarizing event. Given the context of the disagreement, the Probation Department determined it would be adequate discipline to require Boyle and the other officer involved to undergo counseling with a court administrator. Campbell, on the other hand, engaged in what was perceived as racially hostile conduct toward another officer by painting a bullet to resemble Ross's haircut and by calling Ross "Buckwheat" and "Skillet." This was in direct contravention of the department's zero tolerance policy for such conduct. Appellees found that the incident amounted to racial harassment and Campbell was issued a two-day suspension and was warned that, pursuant to department policy, another vi-

olation within a year could result in his termination.

In the case of the Judge Mallory matter, Campbell had been disciplined just several weeks earlier for the bullet incident when he was found to have made the statement about the judge. Consistent with department policy, he was thus terminated. On the other hand, when Boyle was disciplined after the OJ Simpson verdict, his only other incident of misconduct on his record had taken place several years earlier. In addition, a comment by a probation enforcement officer evidencing disrespect for a sitting judge is much more harmful to the efficient operation of the Probation Department than a disagreement between two employees over a highly controversial public event.

### c. Legitimate Reason and Pretext

■ The district court also correctly found that summary judgment should have been granted in favor of Appellees because they had a legitimate reason for terminating Campbell and Campbell has not shown that Appellees' reason is, in fact, pretext for discrimination.

■ Appellees' burden of articulating a legitimate, nondiscriminatory reason for their employment decision to discharge Campbell is satisfied if they "explain what they have done or produce evidence of legitimate nondiscriminatory reasons." *Burdine*, 450 U.S. at 256 (citations omitted). Appellees argue that they could not condone the statement Campbell made about Judge Mallory to Back because such a statement degrades a probationer's respect for the court and her willingness to subject herself to the control of the probation department and undermines the relationship between the court and the probation officers. Campbell has offered no evidence that Appellees' stated reasons for discharging Campbell are in fact pre-

textual and not legitimate, nondiscriminatory reasons. Thus, even if Campbell had established a *prima facie* case of discrimination, Appellees would still be entitled to summary judgment on Campbell's Title VII claim.

### 2. Claim Against the State

Because we have concluded that Campbell's rights under Title VII were not violated by his termination, we need not address the issue of whether Campbell, in his capacity of probation officer, was an employee of the state for purposes of Title VII.

### C. Campbell's First Amendment Claim

#### 1. Claim Against The State of Ohio

■■■■ To the extent that Plaintiff has sought to assert a First Amendment or other claims against the state under 42 U.S.C. § 1983 for violation of his First Amendment or other rights, the state is immune from such suits in federal court under the Eleventh Amendment to the U.S. Constitution. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Furthermore, Plaintiff cannot even make a colorable claim that Ohio has waived its immunity by consenting to suit or that 42 U.S.C. § 1983 serves to abrogate the state's immunity. *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Indeed, a state is not deemed a "person" who may be sued under § 1983. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Thus, Plaintiff's suit on that basis is not cognizable.

#### 2. Claim Against Other Appellees

Campbell claims that Appellees violated his First Amendment rights by terminating him for the comment, "Whatever you do, don't dress up in court, Mallory strokes pretty white women," because the comment was protected free speech. The dis-

trict court disagreed, finding that the speech was not on a matter of public concern, and that even if it was, its potential for disruption nonetheless stripped it of First Amendment protection. For the following reasons, the district court reached the correct conclusion.

■■■ The government has a freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large. However, there is no dispute that speech by a government employee is protected by the First Amendment so long as the speech is on a matter of public concern, and the employee's interest in expressing himself on the matter is not outweighed by any injury the speech could cause " 'to the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Connick v. Meyers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (quoting *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). The ultimate question of whether speech is protected is an issue of law for the court to decide. *Langford v. Lane,* 921 F.2d 677, 681 (6th Cir. 1991).

#### a. Public Concern

Speech touches upon matters of public concern if it "relate[s] to any matter of political, social, or other concern to the community." *Connick,* 461 U.S. at 146, 103 S.Ct. 1684, 75 L.Ed.2d 708. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708. *Connick* holds that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual

**328**

circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.* at 147, 103 S.Ct. 1684, 75 L.Ed.2d 708.

■■■■■ To determine whether speech is on a matter of public concern, a court must question "the extent to which the speech advances an idea transcending personal interest or opinion which impacts our social and/or political lives." *Dambrot v. Central Michigan Univ.*, 55 F.3d 1177, 1189 (6th Cir.1995). The proper inquiry is not " 'what might incidentally be conveyed by the fact that the employee spoke in a certain way, [but] the *point* of the speech in question.' " *Id.* at 1187 (6th Cir.1995) (quoting *Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir.1985)) (emphasis in original). As we held in *Dambrot*, "context can provide insight as to intent." *Id.* at 1188.

■■■■ Campbell asserts that the statement about Judge Mallory addressed a matter of public concern because, through the statement, he sought to inform Back about the possible discriminatory attitude of a municipal court judge.[3] As support, he cites to several cases standing for the proposition that freedom to criticize public officials is at the heart of the First Amendment. *See Lucas v. Monroe Cty.*, 203 F.3d 964 (6th Cir.2000); *Chappel v. Montgomery Cty. Fire Dist. No. 1*, 131 F.3d 564 (6th Cir.1997); *United States v. Richey*, 924 F.2d 857 (9th Cir.1991).

Given the content, form, and context of the statement at issue, we agree with the district court that Campbell did not seek to convey a sincere public message about possible discrimination on the part of a municipal court judge. The statement was made by Campbell, a probation officer, to

Back, a probationer with whom Campbell had developed a relationship outside of work, about a pending probation violation while the two were in Campbell's cubicle office. Nothing about the context or substance of Campbell's statement evidences any intent on Campbell's part to bring a wrongdoing to light; rather, it shows that the point of his speech was to provide inside advice to Back on her pending probation violation.

In contrast to the plaintiffs in the cases Campbell cites, Campbell never made any attempt to publicly expose Judge Mallory's alleged discrimination. *See, e.g., Lucas,* 203 F.3d 964 (plaintiff publicly criticized sheriff at meetings of county board of commissioners, with many of his remarks being printed in the local newspaper); *Chappel,* 131 F.3d 564 (plaintiff raised concerns about county fire and ambulance districts and fire chief at board meetings, with the state auditor's office and with county judge executive, with many of the issues plaintiff raised being covered by the local newspaper); *Richey,* 924 F.2d 857 (defendant made comments about judge's bias to several newspaper reporters). Indeed, Campbell vehemently denies ever making the statement about Judge Mallory at all. Because Campbell was not speaking as a citizen upon matters of public concern when he told Back not to dress up in court, but instead as an employee upon a matter of personal interest, it is not for this court to review the Probation Department's decision to terminate him.

### b. Interests Involved

■■■■ Assuming, however, that Campbell did intend to speak on a matter of public concern, his statement must still be assessed to determine whether his interest in expressing himself on Judge Mallory's

---

**3.** Although Campbell denies making the statement about Judge Mallory, we will assume for our purposes that he was the individual who uttered the offending remark.

alleged discrimination is outweighed by the Probation Department's interest in "promoting the efficiency of the public services it performs through its employees." *Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315 (quoting *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731, 20 L.Ed.2d 811). Performing this balancing test, the district court concluded that the balance of interests weigh in favor of the Probation Department. It held, therefore, that Appellees did not unlawfully abridge Campbell's free speech rights regardless of whether his comment touched upon a matter of public concern.

■ Courts may evaluate the following factors in balancing the interests of the employee versus the employer: whether the statement (1) impairs discipline by superiors or harmony among co-workers, (2) has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or (3) impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. *Rankin,* 483 U.S. at 388, 107 S.Ct. 2891, 97 L.Ed.2d 315. Also relevant is the manner, time, and place of the employee's expression in the context in which the dispute arose. *Id.* An employer need not wait until an employee's speech actually causes harm before taking action against the employee. *Connick,* 461 U.S. at 152, 103 S.Ct. 1684, 75 L.Ed.2d 708. *See also Waters v. Churchill,* 511 U.S. 661, 673, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994), (finding that "substantial weight [may be given] to the government employers' reasonable predictions of disruption."). This balancing test is to be applied to what the government employer reasonably found was said by the employee, and not necessarily to what the employee actually said. *Id.* at 676–77, 114 S.Ct. 1878, 128 L.Ed.2d 686. Applying the above factors to the instant case, we find

that the potential disruption Campbell's statement could cause to the efficient performance of the Probation Department strips it of First Amendment protection.

A probation enforcement officer's loyalty to the judges he or she serves is a paramount concern for a probation department and a court system. The judges and the probation officers must maintain a close working relationship. A comment like Campbell's, which expresses disrespect for a sitting judge, impairs that relationship by evidencing a lack of loyalty to the court on the part of a probation officer. Such a comment is likewise harmful to the probation department's goal of encouraging probationers to believe in a fair judicial system and comply with the rules of their probation. In *Jefferson v. Ambroz,* 90 F.3d 1291 (7th Cir.1996), the Seventh Circuit explained the detrimental effect that a comment such as Campbell's can have on the proper performance of a probation department:

> Loyalty and confidence are critical to a probation officer's position .... A probation officer is the most important contact between the court system and the probationers. The biggest responsibility of a probation officer is to ensure that probationers comply with the orders of the court. That ability is necessarily injured when probationers believe that their probation officer lacks confidence in the system.

*Id.* at 1297 (holding that plaintiff probation officer's public criticisms of local justice system were not protected by First Amendment). *See also Klunk v. County of St. Joseph,* 170 F.3d 772, 776 (7th Cir. 1999). Accordingly, even if Campbell's statement touched upon a matter of public concern, it still is not protected free speech.

## II.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court in its entirety.