# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-3405

OFFICER JAMES T. MCGREAL,

*Plaintiff-Appellant,*

v.

ERIC OSTROV, Doctor, VILLAGE OF ALSIP,
KENNETH WOOD, Chief of the Alsip Police
Department, et al.,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 3958—**Charles R. Norgle, Sr.**, *Judge.*

———————

ARGUED APRIL 16, 2003—DECIDED MAY 10, 2004

———————

Before POSNER, COFFEY and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* To hear Officer James McGreal
tell the story, something is rotten in the Village of Alsip.
After running against the mayor and losing by a narrow
margin, McGreal found himself the target of a campaign
to remove him from his long-held post as an Alsip police
officer. He sued the Village of Alsip, the town's Chief of
Police, a police lieutenant, and a psychologist retained by
the Village to assess McGreal's fitness for duty. The district
court granted summary judgment in favor of the defen-
dants, and McGreal appeals. We reverse and remand.

**I.**

We begin with the cast of characters. James McGreal has been a police officer in the Village of Alsip since 1983. The Alsip Chief of Police is Kenneth Wood, and Lt. David Snooks is the department's Field Operations Commander. At the time this suit was filed, Arnold Andrews had been the mayor of Alsip for twenty-four years. Both Wood and Snooks remain in their posts subject to annual reappointment by Mayor Andrews. McGreal served in the department without incident until he challenged Mayor Andrews in the April 1997 mayoral election. After he lost the election to Andrews by a slim 378 votes (the Village has 17,000 residents), McGreal found himself under unprecedented scrutiny from his superiors. Ultimately, they attempted to remove him from his post on the ground that he was unfit for duty. The dispute over McGreal's fitness to serve as a police officer revolves around a number of incidents, followed by a mental health examination. The events overlap in time and we will describe them separately for clarity. We explore the factual circumstances extensively because a full review of the facts casts a pall of suspicion on the Village of Alsip. On summary judgment, of course, we credit McGreal's version of the facts because he is the party opposing judgment. We draw all reasonable inferences in his favor. *Myers v. Hasara*, 226 F.3d 821, 825 (7th Cir. 2000).

**A.**

McGreal's story begins two years before the election. He was on routine patrol late one night in June 1995 when he noticed a number of cars in the parking lot of the Alsip Elk's Club in apparent violation of the local closing time ordinance. He entered the Club and found people concealing video poker machines behind a folding wall. The machines themselves are not illegal but using them to gamble is

prohibited. McGreal promptly fired off a memo to Lt. Snooks about the incident, suggesting that a gambling investigation might be in order. McGreal also mentioned the matter to Sgt. Murray, the head of Alsip vice investigations. Snooks passed the information on to Chief Wood, who told Snooks he would "take care of it." Despite that promise, Wood did not order an investigation at that time. As it turned out, the video poker machines were owned by a company called "Vegas Amusements." Approximately one month after McGreal wrote the memo detailing his suspicions, Vegas Amusements contributed money to the political party controlled by Mayor Andrews. A few days after that, the Mayor signed into law a variance permitting the Elk's Club to have eight video poker machines on the premises rather than the three machines permitted at all other Alsip establishments. At his deposition for this lawsuit, Mayor Andrews could not recall either a company named Vegas Amusements or having ever signed a variance permitting an increased number of the poker machines at the Elk's Club.

A little more than two years later, in late August 1997 (several months after the mayoral election in which McGreal challenged Andrews), McGreal once again found himself at the Elk's Club, this time attending a banquet for his son's Little League team. McGreal observed people lining up to play the video poker machines, which he considered unusual if the machines were purely for entertainment rather than gambling. On September 9, 1997, McGreal wrote another memo, addressed this time to Chief Wood, suggesting again the possibility that the machines were being used for illegal gambling. McGreal cited as evidence the unusual popularity of the machines and the presence of reset switches on each machine, which would facilitate gambling payoffs by keeping score for each user. McGreal also noted that establishments with far fewer poker machines had been investigated for gambling in

the past. McGreal also repeated rumors that in recent years, compulsive gamblers had lost substantial sums on the Elk's Club machines. He noted a rumor that an Alsip Village official was receiving a percentage of the revenue produced by the video poker machines. McGreal concluded that, although he placed no importance on unsubstantiated rumors, it appeared to him that the possibility of gambling at the Elk's Club had been overlooked.

Lt. Snooks replied to McGreal's memo by expressing surprise that McGreal would put these rumors of payoffs in writing and asking McGreal to provide "a more detailed written explanation of these 'rumors' including . . . the names of [the] elected officials." R. 64, Snooks Attachment B. McGreal responded immediately by identifying Mayor Andrews as the elected official involved in the payoff rumor. According to McGreal's memo, an Alsip police sergeant was the source of the rumor. Chief Wood subsequently consulted with neighboring police chiefs to determine how to handle these allegations. Ultimately, he requested that the Cook County Sheriff's Police investigate the charges of gambling at the Elk's Club. In October 1997, the Sheriff's office set up a sting operation and confirmed McGreal's suspicions. The video poker machines at the Elk's Club were in fact being used for gambling. Although Chief Wood claims he asked the Sheriff's police to also investigate whether Mayor Andrews was receiving payoffs, there are no documents memorializing such a request and the Sheriff's office conducted no investigation of the Mayor.

Nonetheless, in early November 1997, Chief Wood discussed with a member of the Illinois State Police Public Integrity Task Force ("PITF") an inquiry into the Mayor's possible involvement in gambling at the Elk's Club. On November 6, 1997, Wood formally requested a probe in writing. A few days later, on November 10, the Mayor caught wind of the investigation and called Chief Wood into his office. According to Wood, the Mayor was visibly upset,

and at the end of the meeting he demanded that the Chief resign by the end of the day or the Mayor would fire him. Wood returned later in the day, accompanied by his lawyer, to discuss the matter further. (At that time, Chief Wood was two months shy of his fiftieth birthday, the date on which certain of his employment benefits vested). At or before this second meeting, Mayor Andrews learned that McGreal was the person behind the call for an investigation into the Mayor's possible connections with Elk's Club gambling. Wood's attorney explained to the Mayor that an investigation was proper and justified under the circumstances. The Mayor was somewhat appeased by the lawyer's explanation, and took no further steps towards Wood's resignation. However, at this same meeting, the Mayor mentioned to the chief that the "McGreal case" was going to be investigated by Thomas McGuire, an attorney who specializes in representing municipalities that are seeking the termination of police officers.

The very first entry in McGuire's billing records for the Village of Alsip shows that on November 10, the day the Mayor demanded Wood's resignation, McGuire traveled to Alsip for a four hour meeting with the Mayor. That evening, at a Village Board meeting, Mayor Andrews announced that a "disgruntled police officer" who had been a candidate against him had made serious allegations about him. The Mayor told the Board he had authorized Chief Wood to select an outside law enforcement agency to investigate "some of these fairy tale charges." Of course, the Chief had instigated the investigation before the Mayor knew about it and thus the Mayor had not authorized the investigation and in fact was quite angry about it. Wood later testified that he did not tell the Mayor about the investigation and would have preferred that the Mayor did not know he was being investigated because it was never appropriate for the subject of an undercover probe to know that he was being investigated. PITF completed the inves-

tigation in March 1998 and informed Chief Wood that the task force had concluded that the allegation of misconduct by Mayor Andrews in connection with Elk's Club gambling was "unfounded." R. 64, Wood Attachment G.

## B.

On August 16, 1997, McGreal arrested Sean Taylor for driving under the influence. Taylor is the son of a city prosecutor in a neighboring town. When McGreal appeared in court for Taylor's initial court date on September 17, he learned that the case had been rescheduled to August 27 without his knowledge. On checking with the court's computer system, McGreal learned that on August 27, two of the citations he wrote for Taylor (driving under the influence and damage to property) had been stricken on the motion of the Assistant State's Attorney handling the case. The third charge, driving with a blood alcohol content of greater than .08, was continued to September 24. At that time, Taylor pled guilty to that charge. McGreal wrote a memo to his supervisors about this incident, explaining the unusual disposition of the case and suggesting that further inquiry was appropriate. McGreal believed that the manner in which the case was handled was indicative of intentional misconduct. Lt. Snooks replied to McGreal's memo, indicating that he had met with Jim McCarter (of the State's Attorney's office) and requested that he look into McGreal's allegations. Snooks reported that Taylor pled guilty to one charge and received a sentence of eighteen months' supervision. The other charges were stricken. Snooks concluded his memo to McGreal with the statement that, "Mr. McCarter believes and I concur that the actions of the involved parties are properly explained and the handling of the case was lawful and proper." R. 64, McGreal Ex. 15. McGreal remained suspicious about Taylor's case because this was the most lenient sentence he had ever seen for a DUI

conviction. In the absence of community service, the lowest fine McGreal had ever seen for a drunk driving charge was a $100 fine for the son of a state senator. Snooks later admitted that his memo to McGreal contained errors and omissions.

McGreal continued to investigate based on what he learned from Snooks' memo. He obtained a copy of the case disposition from the Cook County Court Clerk's computerized system and saw that the sentence recorded there was a one year period of supervision, $150 fine, a victim impact panel, and required attendance at a remedial adult safety education program (at a cost to the offender of approximately $1800). Because Lt. Snooks had previously told McGreal that he had investigated the matter and concluded that the sentence of eighteen months' supervision was appropriate, McGreal concluded that someone had changed the sentence between the time he complained to his supervisor and the time he checked the computer records himself. He fired off a letter to the Judicial Inquiry Board, formally requesting that the actions of the judge involved be investigated. He pointed out that moving the case off of the normal call schedule was irregular as was the dismissal of some of the charges at an initial hearing. He relayed to the JIB that he believed the sentence of eighteen months' supervision for driving with a blood alcohol content greater than .08 and the appearance of a different sentence in the official record after he complained to his supervisor were highly irregular events deserving of further inquiry.

Shortly after Lt. Snooks met with Jim McCarter, McGreal appeared on another DUI matter before the judge who had decided Taylor's case. McGreal noticed that the judge's behavior towards him had changed. After filing his charge with the JIB, he sent off a letter to the presiding judge, suggesting that the judge involved had been informed of McGreal's intradepartmental complaint. He told the presiding judge that the judge's behavior during an October 15

court call was "prejudicial and radically different than normal." R. 64, McGreal Dep. Ex. 17; R. 64, McGreal Dep., Vol. III at 58. He suggested to the presiding judge that the judge's conduct toward him was a result of his filing a request for inquiry into the Taylor case. He concluded by explaining that he wished to inform the presiding judge of the existence of a formal complaint with the JIB and the change in behavior of the judge in question.

## C.

On August 30, 1994, McGreal was on routine patrol on the midnight shift when he spotted a car in the parking lot of the Copacabana Bar ("the Copa"). Because the bar was closed (it was 3 a.m.), McGreal stopped to investigate. The driver of the car was John Hernandez, a man McGreal had encountered in a hotel parking lot some six years earlier. After the earlier meeting, McGreal had learned that Hernandez was known to be involved in narcotics. McGreal questioned Hernandez about his presence in the Copa parking lot after hours, and Hernandez claimed he was a part-owner of the establishment. This claim piqued McGreal's interest because ownership of a bar by a felon violates both Illinois law and an Alsip ordinance.

McGreal was well-acquainted with the bar because the police were called to the Copa more than twice as often as they were called to any other liquor establishment in Alsip. The Copa also had ties to the Mayor. The owner of record, George Rusick, was a good friend of Mayor Andrews, and the Mayor patronized the bar. Indeed, the Mayor appeared in a local television advertisement for the Copa. Moreover, the Mayor had been involved in a car accident as he was exiting the Copa parking lot at 4:30 one morning. Rusick drove Mayor Andrews away from the scene of the accident before police arrived and later testified for him at trial. The Mayor turned himself in to the Alsip police department the

afternoon after the accident, much too late to be given a meaningful blood alcohol test. He was charged with leaving the scene of an accident and failure to yield. The record does not reveal how these charges were resolved.

After running into Hernandez in the Copa parking lot, McGreal discussed the issue with Sgt. Murray and filed a police report on the incident. Murray followed up by interviewing Hernandez. Hernandez told Murray he had worked for George Rusick and that, in lieu of payment for his services, Rusick agreed to allow Hernandez into the business as a part owner. Sgt. Murray drafted a two-page handwritten police report on the matter documenting what he believed was an illegal ownership situation at the Copa based on his belief that Hernandez was a felon. Sgt. Murray showed this report to McGreal. Murray's report corroborated McGreal's information. On the second page of his report, Murray recommended that the liquor commissioner initiate proceedings against the Copa. Perhaps coincidentally, Mayor Andrews served as the town's liquor commissioner.

Normally, when an officer submits a report, a secretary sends it to the official files. When Chief Wood read Murray's report, however, he gave the report back to Murray and told him to "come back with a different conclusion" unless more evidence was uncovered. Murray then spoke to Hernandez again and confirmed that Hernandez performed work for Rusick in exchange for a promise of an ownership interest in the business. Murray then submitted the report again. The first page of the new report was identical to the first page of his earlier filing but the second page now contained a different conclusion, that no further action would be taken. The original second page was later destroyed.

Approximately nine months later, McGreal asked Murray about the investigation of the Copa. Murray replied that he

had not worked on the investigation because he had given the matter to Chief Wood. McGreal then asked Chief Wood about the investigation. Wood told him that Murray was still working on it. McGreal then went to the records section of the Department and requested the file for the case. The official file contained McGreal's report but neither version of Sgt. Murray's report. McGreal told the Chief about the missing report and followed up with a memo requesting the full contents of the file. As a result of this request, McGreal received another copy of his own two-page report and a third, one-page, typed report written by Murray that was different from either of the first two reports. The new report was not dated, but the case file number contained a hand-written strikeover from "95" to "94." To McGreal, this suggested that the new report was created in 1995 when he had raised the matter again. When McGreal approached Murray about the new report, Murray asked him to "please drop it."

Some time around the Fall of 1996, Lt. Snooks directed McGreal to search the liquor commission files for the name of a doorman for the Copa for an unrelated underage drinking case. As McGreal searched the files, he discovered a copy of the revised, handwritten two-page document (the one concluding that no further action would be taken). McGreal made two copies of the report, placing one in his evidence locker and delivering the other to Chief Wood, pointing out that the report had been missing from the official department files. McGreal also told Snooks in November 1996 that he believed files were missing from the official records. Everyone agrees this was a serious charge because destroying police reports or removing them from the official files violated the rules and regulations of the department and also may have constituted a crime under Illinois law. McGreal publicized the fact that documents were missing from the files in the course of his campaign against the Mayor. Discovery in this case corroborated

McGreal's claims. The defendants produced a records envelope with a startling notation written by Snooks:

> Original sups from John Murray given to me by Chief 11/24/97 at 0920 as he never placed them into records to prevent officer "digging."

Snooks Dep., Ex 49.

## D.

When McGreal learned that there would be no further investigation of the Copa, he decided to appeal the Mayor's decision to renew the Copa's liquor license. He also decided to further investigate the ties between Hernandez and the Copa on his own time and as a private citizen. He learned from an acquaintance that Assistant Attorney General Mary Sue Feldmeier might have information about Hernandez and the Copa. McGreal called Feldmeier and asked about Hernandez's ties to the Copa. Although he introduced himself as a police officer, he did not intend to convey that he was conducting an official investigation and he was unaware that Feldmeier had apparently misunderstood him and assumed his questions were presented in his official capacity.

In response to his inquiry, she sent him a facsimile at the Alsip Police Department of an Attorney General report. The report stated that Hernandez's girlfriend had acknowledged that Hernandez gave the owner of the Copa $100,000 in cash to become a part-owner of the business. The fax was intercepted by Chief Wood, who called Feldmeier to investigate whether McGreal had given her the impression that his investigation was an official (rather than personal) matter. After speaking to Feldmeier in March 1997, he thought he might have cause to discipline McGreal, but dropped the matter for a time. Feldmeier was not contacted again until November or December of that year, after the

Mayor learned that McGreal had instigated an investiga-
tion into the Mayor's ties to gambling at the Elk's Club. At
that point, Snooks was investigating McGreal for any
possible wrong-doing that would justify his discharge.


## E.

That brings us back to November 1997. Recall that
McGreal had opposed Andrews in the mayoral election
earlier that year, and the Mayor then learned that McGreal
had instigated an investigation into the Mayor's possible
receipt of gambling kickbacks from the Elk's Club. The
Mayor responded to this news first by threatening to fire
Chief Wood and then by hiring a lawyer who specialized in
discharging police officers. The Mayor first met with this
lawyer, Thomas McGuire, on November 10, 1997, the same
day he demanded the Chief's resignation and announced to
the Village Board that he had authorized an investigation
into "fairy tale charges" brought by a "disgruntled" police
officer. Eleven days later, Wood ordered McGreal to appear
for an administrative interview. The topics for the interview
included McGreal's investigation of the ownership of the
Copa, his inquiry into gambling at the Elk's Club, his
handling of the Taylor DUI case, alleged sick time abuse in
1996 and 1997, alleged failure to properly utilize on-duty
time, and his handling of an ordinance violation at the
Copa. From November 21, 1997 through March 12, 1998,
Lt. Snooks interrogated McGreal repeatedly. After five
sessions of questioning totaling more than twelve hours, no
charges were brought against McGreal. Neither Wood nor
Snooks could conclude that McGreal had engaged in
misconduct that warranted discipline or termination.

Instead, about a week after the conclusion of these inter-
rogations, Chief Wood ordered McGreal to report to Dr. Eric
Ostrov, a psychologist (who also happens to be a lawyer), for

a psychological evaluation to assess McGreal's fitness for duty. Dr. Ostrov had provided expert testimony many times over the years for clients of Thomas McGuire seeking to terminate police officers. McGreal's attorney asked why McGreal was being psychologically evaluated and neither Wood nor Snooks responded to the inquiry. McGreal was ordered (under threat of termination) to sign a waiver of his right to privacy, confidentiality and/or privilege with Dr. Ostrov before submitting to the examination. When McGreal signed the document, he noted that he was waiving his rights "under duress." McGreal subsequently submitted to three sessions with Dr. Ostrov as well as a number of psychological tests.

Dr. Ostrov wrote a 21-page evaluation of McGreal based on his sessions with McGreal, the psychological tests, a conversation with Lt. Snooks about McGreal and a conversation with Thomas McGuire regarding McGreal. *See* R. 4, Ex. H. The report recounts the incidents we have described above including McGreal's investigation into the ownership of the Copa, his call to the Assistant Attorney General, his charges about the missing police report, and his conduct during the prosecution of the Taylor DUI. For reasons not explained in the report, Dr. Ostrov apparently credited only the versions of those stories presented by the defendants and their lawyer. He then presented his diagnostic assessment. This part of the report contained a great many details of McGreal's home life, especially regarding his relationships with his three sons, his wife, and his parents and in-laws. Dr. Ostrov also extensively reported on McGreal's version of the many incidents the department cited as problematic. Dr. Ostrov's "diagnostic impression" of McGreal was that he displayed narcissistic, paranoid and histrionic traits, not rising to the level of a personality disorder, citing the Diagnostic and Statistical Manual IV. In other words, McGreal suffered from no identifiable mental illness. Dr. Ostrov concluded, however, that McGreal

had a "marked tendency to make inferences based on highly tenuous evidence." R. 4, Ex. H, at 19. We read this as a charge that McGreal relied on hunches. (If McGreal's allegations prove true at trial, his hunches were remarkably accurate.) Ostrov based this finding on the DUI matter, the Elk's Club investigation, the Copa ownership question and the missing memo incident. He also concluded that McGreal had limited insight into the possible disruptions that his behavior caused. In sum, he stated:

> Based on these results, it is my opinion, to a reasonable degree of psychological certainty, that Officer McGreal should be allowed to continue on full active duty only if he is willing to undertake a course of psychotherapy directed toward helping him gain insight into the vagaries of his reasoning processes, their potential for disruption in the police department and the community, and the relationship to his own psychological needs and functioning. I suggest a course of short-term cognitive psychotherapy once a week for at least 50 minutes a session for a period of time not to exceed three months. . . . If he is unwilling to enlist in such treatment . . . I would recommend . . . that he be found unfit for full active duty due to his potential for undermining the essential quasi-military hierarchical structure of the police department, undermining the essential element of morale in the police department, and undermining the essential element of the police department's having good relationships with external agencies in the community.

R. 4, Ex. H at 20-21.

Dr. Ostrov forwarded his report to Chief Wood, who directed McGreal to appear in his office for a meeting on June 9, 1998. McGreal appeared at the meeting with his attorney. Along with Chief Wood, Lt. Snooks, Thomas McGuire and Dr. Ostrov were also present. Dr. Ostrov reiterated his

conclusion that McGreal need not be removed from active duty so long as he submitted to the prescribed cognitive therapy. McGreal's attorney said that McGreal was willing to consider the therapy, but the meeting ended with Chief Wood handing McGreal a memo placing him on paid sick leave until further notice. McGreal's attorney attempted to clarify by letter what had happened at the meeting. He noted that McGreal had offered to discuss therapy and that the defendants had not responded. McGreal never received a clarifying response from the department. Instead, on June 12, 1998, McGuire sent McGreal's attorney a letter containing a two-part ultimatum. The letter provided that if McGreal wished to have a second medical opinion on his fitness for duty, he was required to submit a completed report to Chief Wood within 17 days. Second, if the contents of the second report did not negate the conclusions of the first report, and if McGreal did not sign a "Proposed Therapy Agreement" then Wood would initiate termination proceedings against McGreal. Chief Wood and Lt. Snooks later claimed not to have authorized McGuire's letter, but on summary judgment we construe the facts in favor of the party opposing judgment, and McGuire claimed he did have authority from his clients to send this letter. Three days before the deadline for McGreal to sign off on the therapy agreement, McGreal filed this lawsuit, alleging that the defendants were retaliating against him for exercising his First Amendment rights.

Approximately two weeks later, McGreal was served with an "Administrative Complaint" filed by Chief Wood, seeking McGreal's termination on the basis of various acts of misconduct. The charges were numerous and varied, and in some cases quite vague. For example, the Complaint notes that McGreal was "cautioned" during his employment about his "lack of proper interaction with his fellow employees" and that he had "not fully accept[ed] said caution." R. 4, Ex. G, ¶ 8. The Administrative Complaint also faults McGreal

for (1) commencing his own investigation into a felon's purported ownership interest in a liquor establishment; (2) falsely accusing Chief Wood of mishandling the records of the Alsip Police Department; (3) using in his campaign against the Mayor information he received while on duty as a police officer (regarding that felon's ownership interest in the bar); (4) conveying to Chief Wood, without proper justification, the rumor that the Mayor was taking payoffs from an Alsip establishment (presumably a reference to the Elk's Club); (5) alleging without proper justification that the Taylor DUI had been improperly handled by the prosecutor; (6) sending a letter to the JIB and the presiding judge of the circuit court accusing a Cook County judge of treating him inappropriately after he pointed out possible wrong-doing by the prosecutor in the DUI case; (7) expressing, in the administrative investigation interviews, that he had little to no confidence in Chief Wood and Lt. Snooks because they served at the pleasure of the Mayor; and (8) failing to agree to enter into psychotherapy to correct "the vagaries of his reasoning processes". McGreal points out that during Woods' nine year tenure as Chief, only one other officer was terminated, an officer who inappropriately fired his gun at unarmed civilians. At the same time, the Department never sought to terminate a third officer (we'll call him Officer Doe) who was reprimanded for consorting with a female civilian in his squad car while on duty, being tardy repeatedly, kissing another officer's wife at a party, verbally abusing civilians with ethnic slurs, tanning at a salon while on duty, falsely calling in sick, carrying a personal pager on duty, driving in an unsafe manner on repeated occasions, wearing an improper uniform, battering his domestic partner and assaulting a police officer who tried to intervene, threatening the life of his domestic partner and other police officers with his gun in the course of this incident, repeatedly attempting to break in to the home of a female Department radio operator, using his official position as a

police officer to intimidate his girlfriend's ex-husband, and failing to attend alcohol counseling as required by the Department.

Meanwhile, McGreal, apparently considered by the Department to be far more dangerous than his violent and abusive gun-wielding fellow officer, was barred from returning to work from June 9 through October 6, 1998 on the grounds that he had been declared psychologically unfit for duty. He was forced to expend reserved sick days in order to draw a salary during this lengthy absence. In July 1998, Wood distributed a memo to all police department personnel barring McGreal from setting foot in the police station. Wood also prohibited McGreal from attending court on his pending cases while he was on leave. Snooks notified court personnel of McGreal's leave status, causing McGreal further embarrassment. The Administrative Complaint was eventually resolved by a settlement which preserved McGreal's right to pursue his claims in federal court. McGreal was still employed as an Alsip police officer as of the time of oral argument.

## F.

McGreal filed a four-count complaint against Dr. Ostrov, Chief Wood, Lt. Snooks and the Village of Alsip. Count I alleged a deprivation of rights guaranteed under the First Amendment by Snooks, Wood and the Village, in violation of § 1983. Count II stated a claim of deprivation of speech rights guaranteed by the Constitution of the State of Illinois. Count III alleged a deprivation of property in violation of due process, where the property at issue was McGreal's interest in the sick time pay he was forced to use in order to continue to receive his salary. Count IV, which was filed under seal, alleged violation of the Mental Health and Developmental Confidentiality Disabilities Act, 740 ILCS 110/1 et. seq., arising from the dissemination of Dr. Ostrov's report.

All of the defendants moved to dismiss Count IV on the grounds that there was no therapeutic relationship between McGreal and Dr. Ostrov, that McGreal signed a waiver of his right to confidentiality, and that public policy favored disclosure of mental health reports to a police officer's supervisors when a mental health evaluation for fitness for duty has been ordered. The district court granted the motion to dismiss, finding that Dr. Ostrov was acting not as McGreal's own psychiatrist[1] but rather as a consultant to the Village to evaluate McGreal's fitness for duty. The court found that although Dr. Ostrov was a therapist whose services would otherwise come within the statutory provisions, McGreal's discussions with him were not subject to the full constraints applicable to confidential communications under the act.

After discovery, the defendants moved for summary judgment on the remaining counts. The court found that the Village could not be held liable for the acts of the mayor or agents of the police department because they were not acting pursuant to a policy of retaliating against free speech. Citing *Monell v. Department of Social Servs. of City of New York*, 436 U.S. 658 (1978), the court reasoned that the municipality could not be held liable even if an admitted policymaker like the Mayor engaged in retaliation against McGreal for engaging in free speech. The key, according to the court, was whether the Village had a policy of retaliating against free speech and McGreal had no evidence of such a policy.

The court then considered the claims against Wood and Snooks in their individual capacities. The court found that Wood and Snooks were entitled to qualified immunity on

---

[1] The district court was apparently under the misapprehension that Dr. Ostrov is a psychiatrist. The undisputed record discloses that he is a psychologist and an attorney.

two different grounds. First, the court engaged in a *Pickering* balancing test, weighing McGreal's right to speak on matters of public interest against the department's need to protect against disruption in carrying out its work. *See Pickering v. Board of Educ. of Township High School Dist. 205, Will County, Illinois*, 391 U.S. 563 (1968). The court concluded that McGreal's speech addressed matters of public concern, namely, possible corruption in the police department and by the Mayor. Balanced against McGreal's interest in making that corruption known (and the public's interest in hearing it), the court found that the police department had a more substantial interest in efficiency, loyalty, morale, public confidence in law enforcement and protecting against actual and potential disruptions in the department and with other city agencies. On balance, then, the court found that Wood and Snooks were entitled to qualified immunity for any actions they took against McGreal because of his speech on these issues. In the alternative, the court found that Wood and Snooks were entitled to qualified immunity because the law surrounding McGreal's claim was not clearly established at the time of these events. According to the district court, it was not clear at the time of these events that the actions taken against McGreal violated his First Amendment rights. The court therefore granted judgment in favor of all of the defendants. McGreal appeals.

## II.

On appeal, McGreal contends that the court misapplied the *Pickering* test. He points out that his alleged verbal missteps are far over-shadowed by the speech and conduct of the unnamed officer who misused his gun as well as his words, an officer whom the department never sought to terminate. McGreal argues that the disparate treatment of Officer Doe demonstrates that the rationales offered

to justify McGreal's treatment by the department are pre-textual. McGreal maintains that the Village should be held liable for the acts of the Mayor and the police chief, and that his claim for violation of the Illinois Mental Health and Developmental Disabilities Confidentiality Act should not have been dismissed. He asks us to apply Circuit Rule 36 on remand.

## A.

We begin with McGreal's § 1983 claim for retaliation in violation of his First Amendment rights. There are four elements to a First Amendment retaliation claim in the employment context. *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002). The appeal comes to us as the result of summary judgment and, thus, our review is *de novo* and McGreal need only demonstrate a genuine issue of material fact as to each element. *Myers*, 226 F.3d at 825 (we review *de novo* a grant of summary judgment as well as a district court's decision that a defendant is entitled to qualified immunity). We construe all facts in a light most favorable to McGreal, the party opposing summary judgment, and we draw all reasonable inferences in his favor. *Myers*, 226 F.3d at 825. In order to make out his First Amendment claim, McGreal must first demonstrate that his speech was on a matter of public concern. Second, he must show that his speech played at least a substantial part in his employer's decision to take an adverse employment action against him. If McGreal carries his burden on these two elements, the defendants may prevail only if, third, they can prove that the government's interest as an employer in efficiently providing government services outweighs McGreal's First Amendment interests, or if, fourth, they can prove that they would have disciplined McGreal even in the absence of his speech. *Gustafson*, 290 F.3d at 906. The defendants' burden in justifying the actions they took against an employee

varies depending upon the nature of the employee's expression. *Connick v. Myers*, 461 U.S. 138, 149 (1983); *Glass v. Dachel*, 2 F.3d 733, 744 (7th Cir. 1993) (Supreme Court unanimously placed the burden on the State to demonstrate a state interest that outweighs the employee's First Amendment rights).

### 1.

We begin with whether McGreal's speech touched on matters of public concern. "Whether a government employee's speech addresses a matter of public concern depends upon 'the content, form, and context [of the speech] as revealed by the whole record.'" *Gustafson*, 290 F.3d at 906-07 (quoting *Connick*, 461 U.S. at 147-48). McGreal's comments included his complaint to the Judicial Inquiry Board about the handling of the Taylor DUI, his statements in the mayoral campaign and in other fora about missing police reports, his repetition of rumors that the Mayor was on the take at the Elk's Club, that illegal gambling was going on at the Elk's Club, and that a felon had an ownership interest in the Copa. The defendants only weakly question whether these remarks touched on matters of public concern. *See Connick*, 461 U.S. at 148 (statements not a matter of public concern where employee was not seeking to inform the public that government agency was not discharging its responsibilities and was not bringing to light actual or potential wrongdoing or breach of the public trust on the part of another public official); *Glass*, 2 F.3d at 741 ("matters of public concern do include speech aimed at uncovering wrongdoing or breaches of the public trust"). Rather they argue that, on balance, the department's interest in effectively and efficiently delivering law enforcement services outweighed McGreal's right to publicly comment on these matters. The defendants also argue that McGreal's statements are not entitled to First Amendment

protection because they were false and made recklessly. We have remarked that a suggestion that statements were made with reckless indifference to their accuracy is not normally relevant to the question whether the issue was a matter of public concern. *See Gustafson*, 290 F.3d at 908. The defendants' theory, presumably, is that false charges of corruption would not really touch on matters of public concern. All of the statements that form the basis for McGreal's retaliation claim involved charges of wrong-doing by public officials and therefore easily meet the element of touching on matters of public concern unless the defendants can demonstrate that McGreal's statements were false and recklessly made. *See Delgado v. Jones*, 282 F.3d 511, 517-18 (7th Cir. 2002) (a communication by a law enforcement officer that contains information essential to a complete and objective investigation of serious criminal activity is content that implicates public concern).

We believe there are genuine issues of material fact both as to the truth of the statements and as to whether the defendants genuinely believed the statements were false when they took action against McGreal for making the statements. For example, McGreal's complaint to the Judicial Inquiry Board was based in large part on misinformation provided to him by Lt. Snooks, who concedes he gave McGreal incorrect information. At the time Lt. Snooks provided this incorrect and incomplete information, he was aware that McGreal was already suspicious about the unusual handling of the Taylor DUI. Yet, as far as we can tell from the record, Lt. Snooks was never disciplined for giving false information in the first place. The department can hardly be heard to complain now about the falsity of information in McGreal's JIB complaint when McGreal's supervisor was admittedly the source of the misinformation. Moreover, the substance of McGreal's missives was that the judge involved began treating McGreal differently after he questioned the handling of the Taylor DUI, and that the

sentence was surreptitiously changed after McGreal complained. The defendants provide no evidence on the truth of McGreal's allegation that the judge treated him differently after he began investigating the handling of the Taylor DUI, and for summary judgment purposes we will assume both that this allegation was true and that the department had no reason to think it was false. The department was also aware that, from McGreal's perspective (because of the incorrect and incomplete information provided by Lt. Snooks), Taylor's sentence was changed after McGreal began looking into the matter. Although this may not have been literally true (we see no evidence in the record that would definitively answer the question), from McGreal's perspective, in reliance on reports from the very people who now accuse him of lying, this charge was true. On summary judgment, we cannot find that McGreal's JIB complaint or his letter to the presiding judge contained falsehoods or that the department honestly believed McGreal was lying in making these charges.

McGreal's suspicions about gambling at the Elk's Club turned out to be true. After McGreal pressed the issue and forced an investigation, the Sheriff's office confirmed that the video poker machines at the Elk's Club were being used for gambling. As for McGreal's repetition of the rumor that a Village official was receiving payoffs from Elk's Club gambling, he identified the Mayor as the subject of the rumor only when ordered to do so and only to his commanding officer. Whether he had heard such a rumor is contested and we will credit his version of events for summary judgment purposes. Thus, we will assume that he did hear such a rumor. McGreal expressed no opinion as to the truth of the rumor itself. Forwarding that information to his commanding officer led to an investigation that appears to have exonerated the Mayor. One would think that (1) given the campaign contribution from the company owning the machines and (2) given the Mayor's preferential treatment of that company, not to mention (3) the delays in

investigating the gambling charge and (4) the later confirmation that the machines were in fact used for gambling, the Mayor would have been relieved to be cleared of the bribery rumors. There is certainly no question that a charge of bribery involving a Village official touched on matters of public concern. The Mayor himself thought the matter worthy of mention at a Village Board meeting. And there was arguably enough smoke in the rumor for McGreal to repeat the charge to his commanding officer in an effort to force the department to check for fire.

The last two statements by McGreal are somewhat related. McGreal reported to his superiors and to the press that a felon had an ownership interest in the Copa. He later charged that documents relating to the investigation of this matter had been altered and removed from the official police files. We will begin with the charge that a felon held an ownership interest in the Copa. McGreal first heard this from the felon himself in the parking lot of the establishment in question. He passed the information on to Sgt. Murray who questioned the alleged owner further and initially came to the conclusion that McGreal's suspicions were correct. Only after an order from Chief Wood to obtain more evidence or come to a different conclusion did Murray change his assessment. Later information from the Attorney General's office further supported McGreal's charge that a felon had an ownership interest in the Copa. Thus, we will assume at this stage of the litigation that McGreal was accurately reporting conduct that is illegal under state and local law, and that his employer was well aware of this.

Next is McGreal's charge that documents were missing from the official police files relating to the investigation of whether a felon owned part of the Copa in violation of state and local law. Again, the record demonstrates that files were in fact missing from the official record. First, McGreal himself checked the file and could not find the original memo shown to him by Sgt. Murray. McGreal later found a

copy of the revised handwritten memo in another filing area and a third typewritten document was provided to him after he reported that a document was missing. This third document was different from the one he knew had been submitted by Sgt. Murray. Discovery later turned up a veritable smoking gun in the form of an envelope marked "Original sups from John Murray given to me by Chief 11/24/97 at 0920 as he never placed them into records to prevent officer 'digging.'" The defendants do not deny that a charge of altering or destroying official police files touches on matters of public concern. Everyone seems to agree that intentionally destroying or removing records from the official file constitutes a crime. The envelope demonstrates that the department knew files were not where they should be and that Wood and Snooks therefore knew McGreal was telling the truth when he made the charge. McGreal thus has enough evidence to demonstrate that his statements touched on matters of public concern, were arguably true and were worthy of First Amendment protection.

## 2.

We turn next to the second element of McGreal's First Amendment claim, whether his speech played at least a substantial part in his employer's decision to take an adverse employment action against him. The defendants do not seriously contest that McGreal's accusations played a substantial role in their decision to seek his termination. We need look only as far as the psychological evaluation and the administrative charge filed against McGreal to confirm that McGreal's speech played a significant role in the department's determination to fire him. The Administrative Complaint faults McGreal for, among other things: (1) falsely accusing Chief Wood of mishandling the records of the Alsip police department; (2) campaigning against the Mayor with information obtained while on duty

as a police officer (regarding a felon's ownership interest in the Copa); (3) conveying to Chief Wood the rumor that the Mayor was taking payoffs to overlook gambling at the Elk's Club; and (4) alleging to the JIB and the presiding judge that the Taylor DUI had been handled improperly. These same statements served as the department's alleged justification for sending McGreal to Dr. Ostrov for a fitness-for-duty evaluation. We will consider separately the fourth element of McGreal's First Amendment claim, the defendants' argument that they would have sought to terminate McGreal even in the absence of his statements. But McGreal has demonstrated a genuine issue of material fact on the issue of whether his speech played a substantial role in the defendants' decision to take adverse action against him.

### 3.

That brings us to the heart of the First Amendment analysis, the *Pickering* balancing. *Pickering*, 391 U.S. at 574. Even if a government employee's speech is on a matter of public concern, the government employer is entitled to restrict that speech if it can prove that the interest of the employee as a citizen in commenting on the matter is outweighed by the interest of the government employer in promoting effective and efficient public service. *Gustafson*, 290 F.3d at 909. A *Pickering* analysis is a highly fact-specific inquiry into a number of related factors:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was

one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public.

*Gustafson*, 290 F.3d at 909. Before analyzing these factors and the pertinent case law, we turn momentarily to a dispute between the parties over our standard of review on the *Pickering* issue.

McGreal argues for *de novo* review, generally because the case comes to us on summary judgment, and specifically because we have held that we review *de novo* the district court's application of the *Pickering* test. *See Bonds v. Milwaukee County*, 207 F.3d 969, 979 (7th Cir. 2000), *cert. denied*, 531 U.S. 944 (2000). The defendants cite *Gustafson* for the proposition that, although our review of the court's legal conclusions is *de novo*, we review the record as a whole, and we will accept the district court's conclusions of historical fact unless they are clearly erroneous. *Gustafson*, 290 F.3d at 906. The Supreme Court reminds us that "[t]he inquiry into the protected status of speech is one of law, not fact." *Connick*, 461 U.S. at 148 n.7. These statements of the standard do not actually conflict. Both parties agree that we review the ultimate conclusion *de novo.* They disagree only on the meaning of "historical fact" in this context. According to the defendants, we must defer to the district court's "findings of historical fact" that (1) Wood and Snooks were of the opinion that McGreal's speech had the potential to disrupt the police department and its relationships with other law enforcement agencies, prosecutors and the courts; (2) Wood and Snooks had legitimate concerns that McGreal's conduct could upset the mission of the police department. McGreal maintains these are hotly contested material facts that must be decided by a jury. McGreal is correct that we will reverse a grant of summary judgment when a material issue of fact is in dispute as to whether the employer's reasons for disciplining an employee involved promoting the efficient and effective operation of a govern-

ment agency. *See Glass*, 2 F.3d at 736. *See also Delgado*, 282 F.3d at 517 (the *Pickering* balancing test can seldom be done on the pleadings alone and in most cases will be possible only after the parties have had an opportunity to conduct discovery). The record here reveals many good reasons to doubt the sincerity of Wood's and Snooks's opinions, concerns and state of mind. We will completely delineate those reasons shortly but in the meantime note a few factors giving rise to a genuine issue of material fact. For example, a great deal of time passed between McGreal's statements and the defendants' determination that there was a "potential" for disruption. Indeed, so much time had passed that a reasonable jury could find that their stated fear of "potential" disruption was pretextual because Wood and Snooks surely knew by then that any danger of disruption had passed. In other words, when the disruption failed to materialize, they could not justify disciplining McGreal by reaching back in time to predict "potential" disruption that they knew in fact had not occurred. Other reasons to doubt their sincerity include the timing of the hiring of Thomas McGuire and the decision to require McGreal to submit to a psychological evaluation when he showed no signs of mental illness or instability.

Given the state of the dispute over this material fact, we will apply *de novo* review. Characterizing the district court's conclusions on the state of mind of Snooks and Wood as "findings of historical facts" is quite a stretch. It is rarely appropriate on summary judgment for a district court to make a finding on state of mind. *Alexander v. Wisconsin Dept. of Health & Family Serv.*, 263 F.3d 673, 681 (7th Cir. 2001) (cases involving questions of intent and credibility are inappropriate for summary judgment); *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir.1985) (" 'Summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles.' ") (quoting *Pfizer,*

*Inc. v. International Rectifier Corp.*, 538 F.2d 180, 185 (8th Cir.1976), *cert. denied*, 429 U.S. 1040 (1977)). When the issue is contested, as it is here, the plaintiff is entitled to have the finder of fact decide the issue, perhaps with a special verdict form that the court can then use to apply the *Pickering* factors to the particular facts of the case. "Historical facts" do not include subjective, contested issues about state of mind. "*Pickering* balancing is not an exercise in judicial speculation. While it is true that in some cases the undisputed facts on summary judgment permit the resolution of a claim without a trial, that means only that the *Pickering* elements are assessed in light of a record free from material factual disputes." *Gustafson*, 290 F.3d at 909. Thus, there is no reason on this disputed record to defer to these so-called findings.

That brings us squarely to the seven factors of the *Pickering* test. Recall that the three statements in dispute are McGreal's complaint to the JIB about the handling of the Taylor DUI, McGreal's statements to Wood and Snooks that reports were missing from the official files, and McGreal's accusation of corruption against the Mayor. For the JIB complaint, the defendants contend that McGreal's statement had a potential negative impact on the Department's image as well as the Department's relationship with judges and prosecutors. They maintain that McGreal's credibility with these other agencies was compromised and the close working relationships between these entities "could have been seriously undermined" if Wood had not stepped in and minimized the damage. They argue that the JIB complaint also caused Wood to lose confidence in McGreal.

As for McGreal's accusations about missing reports, the defendants argue that McGreal made the statements to promote his own self-interest in his political campaign against the Mayor. In doing so, he challenged the integrity of the entire police department, according to the defendants,

and diminished the Department's ability to efficiently deliver law enforcement services. McGreal's repetition of a rumor that the Mayor was on the take had the potential for disruption in the entire Department, defendants explain, because in addition to accusing the Mayor, McGreal implied that the Department was looking the other way when it came to enforcing the law against the Copa. Also, this incident caused Chief Wood to lose confidence in McGreal. The defendants largely rest their case, then, on the potential for disruption in the Department and with outside agencies, and the Chief's loss of confidence in McGreal as a result of these statements. They rely heavily on our decisions in *Kokkinis* and *Jefferson*, one a police officer case and the other involving a probation officer, as analogous cases requiring affirmance here. *See Kokkinis v. Ivkovich*, 185 F.3d 840 (7th Cir. 1999); *Jefferson v. Ambroz*, 90 F.3d 1291 (7th Cir. 1996). We turn to these cases to aid our analysis.

Kokkinis, a patrol officer, appeared on a local television news program in a report on another officer's charges of sex discrimination in the police department. Wearing a ski mask and speaking in an electronically disguised voice, Kokkinis told a reporter that people would be in "utter shock" if they knew what was going on in the police department. When the reporter asked why, Kokkinis replied that everyone was afraid of the police chief's vindictiveness, and that if anyone dared to question one of the chief's decisions, that person's life would be "made miserable." Kokkinis did not directly comment on the other officer's charge of sex discrimination and admittedly had no specific knowledge related to the officer's charge. Kokkinis later admitted he was the masked speaker on the news report. At first, the chief suspended him for five days, ostensibly for violating department rules by appearing on television without first notifying the chief. The Board of Fire and Police Commissioners reversed the suspension but Kokkinis's problems with the department continued. A strange series of events

(Kokkinis accidentally shot himself, his fellow officers learned he was keeping a diary of his interactions with them, problems developed between Kokkinis and his supervisor, and Kokkinis began taking prescription medication for stress) led the chief to order Kokkinis to undergo psychological testing. The evaluation resulted in a finding that Kokkinis was not fit for regular duty, and the chief reassigned him to administrative duties in the station. *Kokkinis*, 185 F.3d at 841-43.

Applying the *Pickering* balancing test, we found that the defendants were entitled to summary judgment. The defendant police chief and police department presented uncontested evidence that the chief believed Kokkinis's statements to be untrue, that he felt the remarks reflected negatively on the department as a whole, that he had been embarrassed by phone calls after the broadcast, and that he was concerned the broadcast would negatively affect officer morale. Other ranking officers concurred in these statements. Kokkinis did not challenge the sincerity of the chief's beliefs. Rather, he argued that reliance on *potential* disruption in the police department was insufficient to tip the *Pickering* balance in the defendant's favor. We held that potential disruption of working relationships caused by the officer's speech was a legitimate factor for the government employer to consider. Citing *Connick*, we noted that when close working relationships are essential to fulfilling public responsibilities, deference to the employer's judgment was appropriate, especially in the context of a law enforcement setting. *Kokkinis*, 185 F.3d at 845-46. We noted that a public employer is not required to wait until working relationships are actually damaged if immediate action might prevent the harm from occurring. *Id.* 185 F.3d at 845. Finally, we were careful to distinguish the situation in which employees were reporting illegal conduct by supervisors and airing grievances in a manner calculated to resolve the problem without jeopardizing the government function. *Id.* 185 F.3d at 846 n.3.

In *Jefferson*, a probation officer repeatedly called into a radio program and identified himself as a local gang member. Using this assumed identity, the officer publicly criticized the police department and the judicial circuit. At times, his calls to the station caused him to be late to work. He made one call from his desk at work. When his employer suspected he was the mysterious caller, he denied any involvement. His employer suspended him, explaining that Jefferson had misrepresented himself on the radio program, had denied he was the caller, had lied about the reason for his tardiness, and had impugned the integrity of the police department and the local judiciary. A newspaper editorial criticized Jefferson for putting a "problematic chill on relations between the police and the court agency" for which Jefferson worked. *Jefferson*, 90 F.3d at 1294. After a hearing regarding Jefferson's conduct, his employer terminated him, finding that he had violated the trust of his immediate supervisors, grievously damaged the probations department's relationship with the police department, and compromised the probation department's relationship with the local courts. 90 F.3d at 1295.

Jefferson sued his employer, complaining that he was terminated in violation of his First Amendment rights. In applying the *Pickering* test, we first found that Jefferson's statements on the radio were clearly of public concern because they were a critique of the local police department and court system. We noted the seven factors that we would consider in determining whether Jefferson's speech outweighed his employer's interest in promoting the efficiency of its judicial system (the branch of government that employed Jefferson). *Jefferson*, 90 F.3d at 1297. Applying those factors, we found that loyalty and confidence were critical to a probation officer's job, and that Jefferson's employer reasonably believed his statements potentially damaged the probation office's public image and its relationship with other law enforcement agencies. 90 F.3d at 1297.

Neither *Kokkinis* nor *Jefferson* requires judgment for the defendants. McGreal does not dispute whether potential disruption is a legitimate factor in the *Pickering* balance. He merely disputes, as a factual matter, whether his employer genuinely feared potential disruption to the Department's operations. In both *Kokkinis* and *Jefferson*, there was no evidence that the employers did not genuinely believe the employees's statements were extremely damaging to agencies involved and to their relationships with other government entities. In contrast, McGreal presents evidence that his employers were aware that his statements were actually or arguably true and that his employers had no legitimate claim to a fear of potential disruption. For example, the Chief knew records were missing from the official files because the evidence shows the Chief is the person who removed them. McGreal's claims about gambling at the Elk's Club also proved to be true after he pressed the point and the Sheriff's office confirmed his well-founded suspicions. As for his statement that the Mayor might have been receiving payoffs related to the Elk's Club gambling, McGreal never presented this statement as true but, when under orders to do so, accurately reported that he heard the rumor from another officer and thought it worthy of investigation in light of the delays in investigating the Elk's Club after his initial report.

These statements were not only true, they were also part of McGreal's duties as an officer to bring to light. Effective police work would be hopelessly compromised if supervisors could retaliate against police officers for communicating factual details that bear on the department's ability to conduct an objective investigation. *Delagdo*, 282 F.3d at 519. "The fact that a police officer's job responsibilities may in some measure overlap with motivations of a well-meaning citizen does not change this analysis." *Id.* "[S]peech that accurately exposes official impropriety or corruption may certainly be described as highly critical of the officials it

targets, yet it has generally been accorded the greatest level of First Amendment protection." *Jefferson*, 90 F.3d at 1298 (Rovner, J., concurring). *See also Glass*, 2 F.3d at 741 (matters of public concern include speech aimed at uncovering wrongdoing or breaches of the public trust). The interest of the employee in speaking out to uncover government malfeasance has often been held to outweigh the interest of the employer in maintaining harmony in the workplace. *Jefferson*, 90 F.3d at 1298 (collecting cases). The key is whether the employer was acting on the facts as the employer *reasonably* found them to be. *Jefferson*, 90 F.3d at 1297. Here, McGreal has raised a genuine issue as to the sincerity and reasonableness of his employer's belief that he was lying and the sincerity and reasonableness of his employer's conclusion that his statements were potentially disruptive to the police department. We have already found material issues of fact relating to the sincerity of the defendants' belief that McGreal was making false statements. We turn to the sincerity of their belief that McGreal's statements posed potential for disruption to Department operations.

We note first that the department was far more concerned with McGreal's statements than it was with the actions of Officer Doe, who engaged in dangerous and criminal behavior. Officer Doe's actions directly affected the Department because he threatened his fellow officers with his service revolver and also repeatedly tried to break into the home of a female Department employee, among other things. The extreme nature of Officer Doe's actions coupled with the Department's failure to take action against him cast doubt on the sincerity of the Department's explanation for disciplining McGreal. The Department claims it sought to discipline McGreal because of the disruptive effect of his statements on Department operations. The Department's only explanation for turning a blind eye to Officer Doe's conduct is that he is an alcoholic. That fact, of course, does

not change the disruptive effect of Doe's behavior on the Department and does not explain why the Department never required a mental health evaluation for Doe, who was actually exhibiting signs of mental illness. McGreal, on the other hand, exhibited no signs of mental illness but merely said things that embarrassed the Mayor and forced the Department to engage in appropriate investigations. This raises a genuine issue as to whether the Department was actually acting out of a fear of potential disruption rather than out of displeasure with the content of McGreal's statements. *See Glass*, 2 F.3d at 742 (because the First Amendment interests in speaking out on matters of public concern are real and important, "the State's asserted interests must likewise be real and important.").

McGreal raises another compelling fact pointing us to the same conclusion. A considerable amount of time passed between the time McGreal made the offending statements and the time the Department determined there was a "potential for disruption." Indeed, so much time had passed that any *potential* disruption would have materialized by the time the Department took action against McGreal. The Department took no action against McGreal until November 11, 1997, when the Mayor learned McGreal had instigated an investigation into whether the Mayor was taking payoffs to look the other way on Elk's Club gambling. On that day, the Village hired an employment lawyer specializing in the discharge of police officers. An extensive administrative review process followed and the Village failed to find a legitimate reason to discipline McGreal. Only then did the Village decide that he was showing signs of mental illness and they sent him to Dr. Ostrov in March 1998. In June 1998, a full seven months after McGreal's statements first got him into hot water with the Mayor, the Village suddenly decided that McGreal suffered from "vagaries of his reasoning process" which were potentially disruptive to Department operations. The seven month delay from the last-

occurring offending speech to the suspension provided a huge window for the potential disruption to materialize. But the defendants proffered no conclusive evidence that McGreal's speech or actions caused any disruptions to police operations between November 1997 and June 1998. The Department, as we discussed earlier, may not reach back in time to November 1997 (and earlier dates) to justify the June 1998 suspension by citing "potential disruption." In *Gustafson*, another police department case, four months passed without any evidence of ill effect from the officers' offending speech before they were transferred to another unit. *Gustafson*, 290 F.3d at 911. We held that when substantial time has passed without incident, "it naturally becomes more difficult for an employer to satisfy its burden of proving that punishment on the basis of anticipated disruption was reasonable." *Id*. "Mere assertions of generalized potential for disruption are in any event insufficient." *Id*. On summary judgment, when we are drawing all reasonable inferences in favor of the party opposing summary judgment, the Village's *post hoc* explanation sounds too fishy to support judgment. *See Glass*, 2 F.2d at 743-44 (where sincerity of employer's belief that police officer's speech would disrupt harmony and morale in department was in dispute, summary judgment is inappropriate). The timing of these events provides a genuine issue of fact regarding the true reason for the Department's actions against McGreal. The timing demonstrates an extreme displeasure with the content of McGreal's statements just as easily as it indicates a concern for potential disruption in the Department. *See Coady v. Steil*, 187 F.3d 727, 732 (7th Cir. 1999) (*Pickering* balance seeks to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public function but simply because supervisors disagree with the content of the employee's speech). Only a trial can determine the true reason the defendants decided to place McGreal on leave.

In considering the other six factors, we think there are genuine issues of fact that further preclude judgment. For example, the parties would have quite different views of whether McGreal's speech interfered with his daily job responsibilities. McGreal has a legitimate argument to make about his speech being necessary to the fulfillment of his duties as a police officer, but the Village may be able to make a compelling case demonstrating that these statements interfered with McGreal's daily responsibilities. As for the time, place and manner in which the remarks arose, some comments were made publicly, some were made privately and under orders to disclose the information, and some were made as part of a political campaign. For some of the remarks, construing the facts in McGreal's favor, he will be able to demonstrate that his statements were vital to informed decision-making. For example, his charges of public corruption were very relevant to decisions to investigate possible crimes and were also relevant to Village elections involving one of the subjects of his speech, the Mayor. *See Connick*, 461 U.S. at 145 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964)) (" '[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.' "). The employer bears the burden of justifying a particular disciplinary action, and a stronger showing may be necessary when an employee's speech more substantially involves matters of public concern. *Connick*, 461 U.S. at 150-52; *Gustafson*, 290 F.3d at 909.

As for whether McGreal should be regarded as a member of the general public, he may well be able to show that for some of the remarks, he was speaking as a member of the general public. A genuine issue of fact exists as to whether he was speaking as a private citizen or as a police officer on at least one occasion, when he called the Attorney General's office to seek more information about the ownership of the Copa. In short, there are far too many open questions for a court to conduct the *Pickering* balancing at this stage of the

proceedings. A judge or jury must decide what the facts are before a court may determine whether, on balance, the government's interest as an employer in efficiently providing government services outweighs McGreal's First Amendment interests.

Finally, we address the fourth element of a First Amendment claim, whether the employer would have disciplined McGreal even in the absence of his speech. Much of the defendants' argument on this point overlaps with the factors in the *Pickering* balancing test and, as we have noted, there are many open factual disputes. The Village, after all, originally explained McGreal's suspension as necessary in light of his refusal to undergo cognitive therapy, a highly suspect explanation in light of the timing of the suspension and the favorable treatment given to Officer Doe, who had engaged in highly dangerous and disruptive behavior that was actually indicative of mental illness. *See Gordon v. United Airlines, Inc.*, 246 F.3d 878, 887-88 (7th Cir. 2001) (employer's disparate treatment of similarly situated employees created question of fact regarding employer's proffered reason for discipline of employee). Under the circumstances, the district court should not have entered judgment in favor of the defendants.

## B.

Wood and Snooks also argued that they were entitled to qualified immunity for their actions against McGreal. Because we are reversing and remanding on the basis of the *Pickering* balancing, we must address this issue. McGreal maintains that qualified immunity is unavailable on this record because if his version of the facts is credited, Wood and Snooks pursued an "unabashed campaign to get rid of him" in order to punish him for engaging in protected expression on matters of public concern. The defendants

contend that they were not on notice that their conduct was unlawful and that they reasonably believed that McGreal was telling lies and falsehoods rather than engaging in protected speech. As we have already discussed, there are genuine issues of material fact regarding the sincerity of the defendants' beliefs. *See Glass*, 2 F.3d at 745 (when a material issue of fact remains as to the reason for defendant's discipline of plaintiff, neither qualified immunity nor ultimate liability may be decided on summary judgment). We will therefore turn to the issue of whether the defendants were on notice that they would be infringing McGreal's First Amendment rights by their actions.

The initial inquiry in determining qualified immunity is whether the facts, taken in the light most favorable to the party asserting the injury, show that the defendant's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). That question is easily answered here because McGreal alleges that Wood and Snooks suspended him from duty as punishment for speaking out on matters of public concern. The First Amendment protects public employees from termination because of their speech on matters of public concern. *Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr*, 518 U.S. 668, 675 (1996).

The next issue is whether the right in question was clearly established at the time of the violation. *Saucier*, 533 U.S. at 201. This inquiry is to be undertaken in light of the specific context of the case and not as a broad general proposition. *Id.* To demonstrate that the law was clearly established, the plaintiff may point to closely analogous cases demonstrating that the conduct is unlawful or demonstrate that the violation is so obvious that a reasonable state actor would know that what he is doing violates the Constitution. *Morrell v. Mock*, 270 F.3d 1090, 1100 (7th Cir. 2001), *cert. denied*, 537 U.S. 812 (2002). Officials may still be on notice that their conduct violates established law

even in novel factual circumstances, however. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The Supreme Court has rejected a requirement that previous cases be "fundamentally similar" before officials can be held to know their conduct was unlawful. *Hope*, 536 U.S. at 741. The salient question is not whether there is a prior case on all fours with the current claim but whether the state of the law at the relevant time gave the defendants fair warning that their treatment of the plaintiff was unconstitutional. *Hope*, 536 U.S. at 741; *Gregorich v. Lund*, 54 F.3d 410, 415 (7th Cir. 1995).

In *Gustafson,* we analyzed the state of the law as of 1993 in the context of *Pickering* and *Connick*, the same context we face here for conduct occurring in 1997 and 1998. We stated:

> [T]he issue is whether any employer could have thought it was entitled to punish an employee for speech on a matter of public concern where the speech caused no actual disruption of any kind for four months, and where the employer neither articulates a belief that the speech has the potential to be disruptive in the future, nor has evidence to support the reasonableness of such a belief. We need look no further than *Connick* to know that the answer to that question is no. The law to that extent was clearly established[.]

290 F.3d at 913. *See also Delgado*, 282 F.3d at 520 (finding it has been well-established for many years that a public employer may not retaliate against an employee who exercises his First Amendment speech rights); *Myers*, 226 F.3d at 829 ("It was, therefore, clear in June 1996 that government employees had a First Amendment right to speak on matters of public concern that must be weighed against the employer's right to punish insubordination."). The posture of the appeal in *Gustafson* was post-trial and the jury had resolved the issues of the credibility of the

police department's explanation for its discipline against its officers. Here we are at the summary judgment stage of the proceedings, and McGreal need only raise genuine issues of material fact as to these issues. As we explained above, he may well be able to show that neither Wood nor Snooks sincerely believed his speech caused any actual or potential disruption, especially in light of the lengthy delay between McGreal's statements and his suspension. The state of the law in 1997 and 1998 was clear; employers could not suspend workers as punishment for disagreeable speech on matters of public concern unless they truly believed that, under the *Pickering* balancing test, their interest in efficient delivery of government services outweighed the employee's right to speak. *See Delgado*, 282 F.3d at 520 ("government efficiency can be equally compromised if government supervisors can freely pursue retaliation for speech that is politically sensitive or embarrassing"). At this stage of the proceedings, because the sincerity of their belief and the true cause of the suspension are at issue, Wood and Snooks are not entitled to judgment on the issue of qualified immunity.

## C.

The Village of Alsip contends it may not be held liable for the acts of Mayor Andrews, Chief Wood or Lt. Snooks unless McGreal can meet the standards for municipal liability set by the Supreme Court in *Monell v. Department of Social Servs. of the City of New York*, 436 U.S. 658 (1978). In general, liability for a Section 1983 claim may not be imposed on a city on a theory of *respondeat superior. McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995); *Baxter by Baxter v. Vigo County School Corp.* 26 F.3d 728, 734 (7th Cir. 1994) (superceded by statute on unrelated point). Rather, "it is when the execution of a government's policy or custom, whether made by lawmakers or by those

whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694; *Baxter*, 26 F.3d at 734. Both sides agree that there are three sets of circumstances in which a municipality can be said to have violated the civil rights of a person because of its policy:

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*McTigue*, 60 F.3d at 382; *Baxter*, 26 F.3d at 734-35. McGreal relies entirely on the third scenario to make his case against the Village of Alsip.

McGreal points to the following admissions made by the defendants in response to requests to admit as dispositive of the issue:

> In initiating the process to terminate Officer McGreal, Chief Wood was acting as a municipal policymaker with final policymaking authority in that regard.

> In seeking to force Officer McGreal to undergo psychological counseling, Chief Wood was the municipal policymaker with final policymaking authority in that regard.

Appellant's Br. at 49. In support of these admissions, McGreal cites to his Local Rule 56.1 Statement, ¶ 121, which in turn supposedly cites to Plaintiff's First Set of Requests to Admit, ¶¶ 43 and 45. He cites to a portion of Snooks' deposition as well. The defendants contend that McGreal's assertion that the Village admitted Wood was a final policymaker in his dealings with McGreal is "a

complete misrepresentation of the record." Response Br. at 38. According to the defendants, they admitted only that Wood was the final decision-maker, not the final policymaker, in the decision to initiate termination proceedings against McGreal. In support, the defendants cite to Defendant's Responses to First Requests to Admit at ¶ 45.

Both of the parties have done this Court a disservice with their sloppy briefing on this very important issue. First, when we turn to R. 53, which contains Plaintiff's Local Rule 56.1 Statement, the page containing the cited paragraph, ¶ 121, is missing from both the official record and from the copy provided by Plaintiff as an appendix to his brief on appeal. Second, upon reviewing the Defendants' Responses to Plaintiff's First Requests to Admit, Exhibit G to R. 100, the actual responses do not fully support either party's characterization of the record. Here, instead is what the elusive answers actually state:

> 43. In initiating the process to terminate Officer McGreal, Chief Wood was acting as a municipal policymaker with final policymaking authority in that regard.
>
> **RESPONSE** Admit.
>
> 45. In seeking to force Officer McGreal to undergo psychological counseling, Chief Wood was the final policymaker with final policymaking authority in that regard.
>
> **RESPONSE** Deny.

R. 100, Ex. G., ¶¶ 43 and 45.[2] Third, and equally frustrating, is the absence from the record of that portion of Snooks' deposition on which McGreal also relies.

---

[2] The plaintiff concedes in his reply brief that the defendants admitted only Request 43 in discovery but maintains that this admission alone is sufficient to establish municipal liability.

In the end, the record tells a conflicted tale. McGreal at first incorrectly reported that the defendants admitted ¶ 45 of the First Requests to Admit. The Village incorrectly characterized its admission regarding Chief Wood as applying only to "decision-making" rather than "policymaking." The Village clearly admitted Wood was a policymaker in some regards but denied it in others. Nor can the Village claim that McGreal has completely misrepresented the record because he has accurately reported at least one part of the admission. We will hold the Village to its admission regarding Chief Wood and turn to the cases to consider whether this admission is adequate to generate a genuine issue of material fact under the standard set by *Monell* and its progeny.

"It is true that a single act or decision of a final policymaker can establish municipal policy." *Baxter*, 26 F.3d at 735; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). As a corollary of this point, the plaintiff must first allege that a defendant is a final policymaker. *Baxter*, 26 F.3d at 735. Only then can a court proceed to the next question of whether the single act or single decision of that defendant constituted municipal policy. *Id.* Here, of course, the plaintiff not only alleged that one of the defendants was the final policymaker in regard to the act in question, but the defendants actually admitted that this was the case. The defendants conceded that Chief Wood was acting as a municipal policymaker with final policymaking authority in regards to initiating termination proceedings against McGreal.

> [A] government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood. More impor-

> tantly, where action is taken by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.

*Pembaur*, 475 U.S. at 481. Under this standard, Wood's initiation of termination proceedings against McGreal in retaliation for McGreal's public speech is an act attributable to the municipality because the municipality has conceded that Wood was acting as a municipal policymaker in that respect.

Normally we look to state law to determine whether a § 1983 defendant is the kind of decision-maker with final authority whose actions can subject a municipality to liability. *Radic v. Chicago Transit Authority*, 73 F.3d 159, 161 (7th Cir. 1996), *cert. denied*, 517 U.S. 1247 (1996); *Abbott v. Village of Winthrop Harbor*, 205 F.3d 976, 982 (7th Cir. 2000). Despite their admission, the defendants in the instant case now claim that a police chief cannot be a final policymaker as a matter of Illinois law. They rely on *Auriemma v. Rice*, 957 F.2d 397, 399-400 (7th Cir. 1992) and *Horwitz v. Board of Educ. of Avoca School Dist. No. 37*, 260 F.3d 602, 619 (7th Cir. 2001), for the proposition that, under Illinois law, neither a police chief nor a village president are final policymakers. Neither case supports that proposition.

*Auriemma* involved a charge of race discrimination in the Chicago police department. The Municipal Code of Chicago expressly bans racial discrimination in the police department and grants the chief of police authority only to administer the department in a manner consistent with the city ordinances, state law and police board rules and regulations. We held therefore that a decision by the chief of police to discriminate on the basis of race would thwart rather than implement the will of the City. Because the chief was not the final policymaker under City ordinances, the City could not be held liable for his actions. 957 F.2d at

399-401. Here, of course, we are not dealing with the City of Chicago but rather the Village of Alsip which operates under its own codes and procedures. The Village's policies and ordinances are not part of the record except for the defendants' concession that the police chief acted as a municipal policymaker with final policymaking authority when he sought to terminate McGreal. *Auriemma* does not aid the Village's argument.

*Horwitz* does not help the Village either. The plaintiff there sought to hold a local school board (a subdivision of a municipality) liable for a discriminatory act by the president of the board, a school principal and the district superintendent. The court noted an absence of even "bare allegations" from which to string together an argument that the individual defendants enjoyed final policymaking authority. Looking to state law, nothing in the Illinois School Code allowed an inference that any of these individuals had final policymaking authority. 260 F.3d at 619. It should go without saying that the Illinois School Code does not control the policy of the Alsip police department, so we are again perplexed by the defendants' reliance on this case. In any case, Alsip's admission distinguishes McGreal's case from *Horwitz*. In light of the defendants' admission, Alsip is not entitled to summary judgment on the issue of municipal liability. *See also, Kujawski v. Board of Commissioners of Bartholomew County, Indiana*, 183 F.3d 734, 739 (7th Cir. 1999).

**D.**

Snooks argues separately that he is entitled to summary judgment because of the dearth of evidence on his role in the events at issue. According to the defendants, at most Snooks followed the orders of his superiors in any actions he took regarding McGreal, and cannot be held personally liable for any harm McGreal suffered as a result. At this

stage of the litigation, we believe there is enough evidence of personal involvement by Snooks to keep him in the case. For example, he was the person who gave McGreal incorrect information about the disposition of the Taylor DUI, who demanded that McGreal name the public official allegedly taking bribes in a gambling cover-up, and who noted on a file jacket that original copies of police reports were removed to prevent "officer digging." Yet he is also the person who interrogated McGreal about potential wrong-doing in each of these events, even though he knew he had misled McGreal about the Taylor case, knew that McGreal named names only when ordered to do so, and knew that McGreal was telling the truth about missing police reports. A jury could infer that Snooks was deeply involved in the retaliation against McGreal. It would be premature to grant judgment in favor of Snooks.

## E.

The final count at issue is McGreal's Illinois statutory claim under the Mental Health and Developmental Disabilities Confidentiality Act ("Confidentiality Act"). *See* 740 ILCS 110/1 *et seq.* Chief Wood ordered McGreal to undergo an evaluation by Dr. Ostrov, a psychologist hired by the Alsip police department. At their first meeting, Dr. Ostrov presented McGreal with a form titled "Consent for Evaluation." When McGreal balked at signing the consent, Dr. Ostrov called Snooks who then ordered McGreal to sign the form. McGreal signed the form with the notation "signed under order of Lt. Snooks and under duress." R. 21. The consent form, in its entirety, provided:

> I, Ofcr. James McGreal, agree and understand that Dr. Eric Ostrov has been asked by Alsip PD to evaluate my fitness for duty as a to [sic] Alsip PO. I understand that Alsip PD will pay for this evaluation and that they will receive a report based on this evaluation that will

> include an opinion about my fitness for duty and evidence to back that opinion. I understand Dr. Ostrov is not my psychotherapist and that what I say to him or communicate to him is not confidential. I understand that if Dr. Ostrov is called upon to testify regarding this evaluation, if appropriate, he will do so. I understand I have a right not to cooperate with this process but that if I do not do so, that fact will be communicated to Alsip PD. I further understand that since Alsip PD is the client of FPA, all data and the report resulting from this evaluation belongs to them. Accordingly, I waive any right I may have to know test results, interpretations made, and access to the original data from which final judgments have been made.

R. 21.[3] McGreal signed the consent, noting the duress, and Ostrov served as a witness to his signature.

Dr. Ostrov then interviewed McGreal over the course of three sessions. Ostrov had already been briefed by Wood, Snooks and the Village attorney in preparation for the evaluation. Ostrov eventually produced a 21-page report summarizing his findings on McGreal based on his three sessions with McGreal and his briefings from Wood, Snooks and the Village attorney. The report, as we described earlier, contained a great deal of personal information about McGreal's family life, some of it very sensitive. Ostrov produced the report to Wood, Snooks and the Village attorney, neglecting to label the report "confidential." After this law suit was filed, Wood forwarded the report to McGreal's colleagues at the F.O.P., ostensibly in response to a grievance filed by McGreal. McGreal objected to the

---

[3] We have omitted the letterhead for Forensic Psychology Associates ("FPA"), Dr. Ostrov's firm. We have also omitted certain irrelevant strikeouts and misplaced punctuation for ease of reading.

disclosure of the report, questioning the validity of his consent and also the scope of the information disclosed in the report. The defendants moved to dismiss McGreal's claim for breach of the Mental Health Confidentiality Act, and the court granted the motion. The court found that McGreal was not a "recipient" of mental health services as that term is defined by the Confidentiality Act because he met with Ostrov only to facilitate Alsip's ability to evaluate McGreal's fitness for duty. On appeal, McGreal contends that he is a "recipient" under the plain language of the statute, that his consent was invalid and in any case was later withdrawn, and that the disclosure far exceeded what was necessary to determine his fitness for duty. The defendants maintain that McGreal was not a recipient of mental health services, that his consent vitiates any claim he has regarding disclosure of information obtained by Ostrov, and that public policy requires an exception be made in the case of police officers being tested for fitness for duty.

The Confidentiality Act prohibits disclosure of mental health records and communications except as provided by the Act. 740 ILCS 110/3(a). The records covered by the Confidentiality Act include "any record kept by a therapist or by an agency in the course of providing mental health . . . service to a recipient concerning the recipient and the services provided." 740 ILCS 110/2. Mental health services include but are not limited to "examination, diagnosis, evaluation, treatment, training, pharmaceuticals, aftercare, habilitation or rehabilitation." 740 ILCS 110/2. A recipient is a person who is receiving or has received mental health services. 740 ILCS 110/2. The term "therapist" includes psychologists, among others. 740 ILCS 110/2. Under the straightforward terms of the Act, Dr. Ostrov, who is a psychologist, qualifies as a therapist; his examination, evaluation and diagnosis of McGreal constitute mental health services; McGreal is a recipient under the plain language; and Ostrov's resulting report is a covered record.

The Confidentiality Act contains no disclosure exception for police departments performing mental health examinations to determine fitness for duty. It does allow for disclosure on consent, but the consent form used here does not meet the standards set forth by Illinois law. *See* 740 ILCS 110/5(b) (listing what is required for valid consent).

The Illinois Supreme Court notes that the "Confidentiality Act is carefully drawn to maintain the confidentiality of mental health records except in the specific circumstances explicitly enumerated." *Norskog v. Pfiel*, 755 N.E.2d 1, 9 (Ill. 2001) (quoting *Sassali v. Rockford Memorial Hospital*, 693 N.E.2d 1287 (Ill. App. 2d Dist.1998)).

> In each instance where disclosure is allowed under the Act, the legislature has been careful to restrict disclosure to that which is necessary to accomplish a particular purpose. Exceptions to the Act are narrowly crafted. When viewed as whole, the Act constitutes a "strong statement" by the General Assembly about the importance of keeping mental health records confidential. That a high value is placed on privacy is evidenced by the fact that the privilege afforded a recipient of mental health treatment continues even after the recipient's death.

*Norskog*, 755 N.E.2d at 10 (internal citations omitted). The Court also noted that it was in the public interest to zealously guard against erosion of the confidentiality provision. *Id.* Therefore, "anyone seeking the nonconsensual release of mental health information faces a formidable challenge and must show that disclosure is authorized by the Act." *Id.*

Consent to disclose, as we have noted, is one of the exceptions to strict confidentiality under the Act. "Section 5 of the Act makes it clear that a recipient may consent to disclosure of information for a limited purpose and that any agency or person who obtains confidential and privileged

information may not redisclose the information without the recipient's specific consent." *Norskog*, 755 N.E.2d at 14. The release of information for a limited purpose under the consent provision does not operate as a general waiver of the confidentiality privilege. *Id.* The Court in *Norskog* strictly construed the statutory exceptions to confidentiality and refused to recognize a "fundamental fairness" exception under the circumstances of that case. *Norskog*, 755 N.E.2d at 14-18.

In tension with the Illinois Supreme Court's ruling is *Sangirardi v. Village of Stickney*, 793 N.E.2d 787 (Ill. App. 1st Dist. 2003). Sangirardi was discharged from his duties as a Stickney police officer when he refused to obey an order requiring him to consent to the release of the results of a mental health "fitness for duty" exam. The chief of police had ordered the fitness exam based on reports from a detective, a citizen, a police officer and a sergeant complaining about Sangirardi's conduct. *Sangirardi*, 793 N.E.2d at 798. Sangirardi first resisted the exam and then refused to allow the release of the results to the police chief. After he was fired for insubordination, he brought an administrative action challenging his discharge. The Village Board of Fire and Police Commissioners found that the police chief had reasonable cause to order the fitness exam and that there was a strong public interest in the department assuring that officers have the psychological stability to perform their duties as police officers. 793 N.E.2d at 794. The Board upheld the discharge and Sangirardi appealed through the Illinois courts.

The Court of Appeals noted that, under Illinois law, a police chief has the authority to order an officer to submit to a fitness exam:

> The authority to order fitness exams is justified by the unique, almost paramilitary nature of police departments and the critical importance of police officers to public health and safety. By necessary implication, the

police department must have access to the ultimate fitness determination of such exams in order to determine whether officers are capable of performing their duties.

*Sangirardi*, 793 N.E.2d at 798. *See also Haynes v. Police Board of the City of Chicago*, 688 N.E.2d 794, 797-98 (Ill. App. 1st Dist. 1997) (police officer's refusal to obey a direct order was not justified by his mistaken belief that he should not have to take a psychological examination); *Conte v. Horcher*, 365 N.E.2d 567, 568-69 (Ill. App. 1st Dist. 1977) (police chief has the power to order a psychiatric examination of a police officer to determine whether the officer is able to perform the duties required for the job and to assure the effective performance of the department). The court found that the chief's order that Sangirardi submit to a fitness exam was based on multiple complaints about the officer's conduct. As such, it was a reasonable order. 793 N.E.2d at 798. Because the order to take the exam was reasonable, then logically, the police chief was entitled to view the results of the exam. *Id.* The court distinguished a number of confidentiality cases on the ground that none involved the disclosure of officers' fitness exams to their superiors. Ultimately, the court ruled, the recipient's expectation of privacy is dispositive in determining the disclosure of mental health information. 793 N.E.2d at 799. The court rejected Sangirardi's claim that he retained an expectation of privacy because he refused to sign the consent form. The court found that, as a police officer, Sangirardi had no reasonable expectation that the results of his fitness exam would be kept confidential from the police chief because "fitness exams are part and parcel of the process officers must undergo in order to be hired and retained." The court ruled that the Act was not applicable to the facts presented, where the police chief's testimony and order established that he did not compel the release of Sangirardi's mental health records, but only the ultimate fitness for duty recommendation. 793 N.E.2d at 799.

We believe this ruling is in tension with the Illinois Supreme Court's holding in *Norskog*, which allows for disclosures only under the narrow exceptions defined by the statute, but we need not resolve that tension here.[4] The crux of McGreal's complaint is that the department had no valid reason to order him to submit to the fitness exam in the first place. He maintains they were simply trying to manufacture a reason to fire him in retaliation for his exercise of his First Amendment rights. Even under *Sangirardi* the department would not be entitled to require a mental health exam for this purpose. Moreover, under *Sangirardi*, the defendants were not entitled to disclosure of anything other than the fitness for duty determination. They were not entitled under any Illinois law to force the disclosure of the intimate and irrelevant details of McGreal's home life. Finally, McGreal claims that dissemination of the report was broader than necessary to determine his fitness for duty and also that the defendants republished the information without his further consent as required by the Confidentiality Act. Under these circumstances, McGreal is entitled to have a jury hear his claim and determine whether the defendants reasonably ordered the exam and whether the disclosure and republication

---

[4] We note that the Court of Appeals could have served the competing public policy interests in maintaining mental health confidentiality and ensuring a mentally fit police force by simply requiring the use of the consent form detailed in the statute at 740 ILCS 110/5. For example, if the officer disobeyed a reasonable order to submit to a mental health exam and refused to sign a valid consent to the disclosure necessary to determine fitness for duty, then the police department would be justified in discharging the officer. An officer could choose not to consent to disclosure but could not, in that instance, retain his position as a police officer. Use of the consent provision would ensure that all parties were aware of their rights and duties under Illinois law and would not require an exception outside the statutory scheme.

exceeded the scope necessary to determine fitness for duty. Such a claim would be consistent with both *Norskog* and *Sangirardi*. We therefore reverse the district court's judgment in favor of the defendants on the Confidentiality Act claim and remand for a trial on the merits.

## III.

In summary, we find that the district court erroneously granted summary judgment in favor of the defendants on McGreal's First Amendment claim and on his Confidentiality Act claim. We reverse that judgment and remand for a trial on these claims consistent with this opinion. Circuit Rule 36 shall apply on remand.

REVERSED AND REMANDED.

A true Copy:

    Teste:

                _____
                *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*